# UNITED STATES DISTRICT COURT
## DISTRICT OF IDAHO

| | |
|---|---|
| IDAHO CONSERVATION LEAGUE, | Case No.: 1:18-cv-353-REB |
| Plaintiff, | **MEMORANDUM DECISION AND ORDER RE: DEFENDANT SHANNON POE'S MOTION TO DISMISS PLAINTIFF IDAHO CONSERVATION LEAGUE'S COMPLAINT** |
| vs. | |
| SHANNON POE, | |
| Defendant, | **(Dkt. 17)** |

Pending before the Court is Defendant Shannon Poe's Motion to Dismiss Plaintiff Idaho Conservation League's ("ICL") Complaint (Dkt. 17).  Having carefully considered the record, participated in oral argument, and otherwise being fully advised, the Court enters the following Memorandum Decision and Order:

## I.  RELEVANT BACKGROUND

**A.    The South Fork Clearwater River**

1.    The South Fork Clearwater River is a navigable water located in north-central Idaho, which the State of Idaho has designated as a State Recreational River.  *See* Compl., ¶ 40 (Dkt. 1).  The South Fork Clearwater River is also eligible for designation under the federal Wild and Scenic Rivers Act due to its remarkable values.  *See id.*

2.    The South Fork Clearwater River is a habitat for many native fish species, including those listed as "threatened" under the Endangered Species Act (Snake River steelhead trout, Snake River fall Chinook salmon, and Columbia Basin bull trout).  *See id.* at ¶ 42.  The Nez Perce Tribe also rely on the South Fork Clearwater River in their efforts to reintroduce native coho salmon and Pacific lamprey.  *See id.* at ¶ 43.  In 2010 the United States Fish and

Wildlife Service ("USFWS") designated the South Fork Clearwater River as a critical habitat for bull trout. *See id.* at ¶ 42.

3.      The South Fork Clearwater River is designated by the State of Idaho as an "impaired" water body along its entire length due to excessive sediment and temperature pollution. *See id.* at ¶ 44. Bank stabilization, channel stabilization, bank re-vegetation, and sediment traps have been implemented on the South Fork Clearwater River in an effort to control sediment pollutants. *See id.* at ¶ 45.

**B.      Suction Dredging and NPDES Permit Requirements Under the Clean Water Act**

4.      Suction dredge mining involves using a floating watercraft device with a pump to suck water, riverbed sands, and minerals through a nozzle in an effort to sort gold. *See* Opp. to MTD, p. 3 (Dkt. 20). The water, sand, and minerals are then discharged back into the river, along with sediments and potential pollutants. *See id.*

5.      Under the Clean Water Act ("CWA"), a National Pollutant Discharge Elimination System ("NPDES") permit is required to operate a suction dredge due to potential sediment pollution arising from the activity. *See id.* NPDES permits are issued by the Environmental Protection Agency ("EPA") on a yearly basis to dredgers that meet and follow certain conditions to prevent harm to aquatic environments. *See id.*

6.      The CWA prohibits the "discharge of any pollutant by any person" to waters of the United States, unless authorized by an NPDES permit. *See* 33 U.S.C. §§ 1311(a), 1342(a); *see also* Compl., ¶ 18 (Dkt. 1). The CWA defines "discharge of a pollutant" as "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12); *see also* Compl., ¶ 19 (Dkt. 1).

7.      To facilitate NPDES permitting for pollution discharges from suction dredges in Idaho, the EPA issued the "NPDES General Permit" in 2013 and reissued it in 2018. *See id.* at

¶ 24.  Suction Dredge General Permits are available to miners discharging pollutants from small suction dredges (dredges with intake nozzles less than or equal to five inches in diameter and a cumulative rating of 15 horsepower or less) to some but not all Idaho rivers.[1]  *See id.* at ¶ 25. Suction Dredge General Permits place conditions on the discharge of rock and sand from each mining operation and require monitoring and reporting to protect water quality and aquatic resources.  *See id.*

a.  Suction Dredge General Permits include effluent limits which (1) prohibit any visible increase in turbidity (any cloudiness or muddiness) above background levels beyond 500 feet downstream while a dredge operates, and (2) require modification, curtailment, or cessation of dredging to stop any such violation.  *See* Opp. to MTD, p. 4 (Dkt. 20).  On the South Fork Clearwater River, dredgers must also (1) limit processing to an average of two cubic yards per hour over an eight-hour day, and (2) meet additional specific turbidity limits, depending on background turbidity levels.  *See id.*

b.  Suction Dredge General Permits also include 12 best management practices, addressing silt and clay areas, encountering mercury, operating 800 feet apart, fish passage, spawning fish and spawning habitat, alterations to the active stream channel, erosion and undercutting, dams and diversions, moving natural obstructions, other mechanized equipment in water, refueling and hazardous material storage, invasive species, and screen mesh opening for intake nozzles.  *See id.*  Permittees must display their Miner Number on their dredge and vehicle and monitor and report turbidity daily.  *See id.*

---

[1]  Before 2016, Suction Dredge General Permits were not available to miners dredging on the South Fork Clearwater River because threatened fish species protected under the Endangered Species Act inhabited its waters.  *See* Compl., ¶ 28 (Dkt. 1).  However, in 2016, the United States Forest Service ("Forest Service") and the Bureau of Land Management ("BLM") completed a process making the Suction Dredge General Permits available to up to 15 miners each year on the South Fork Clearwater River.  *See id.*

8.      To obtain authorization to discharge pollutants from a suction dredge for an operation that is not eligible for the Suction Dredge General Permit, a miner must apply for and receive an individual NPDES permit from the EPA.  *See* Compl., ¶ 27 (Dkt. 1).  Individual NPDES permits must include conditions that will ensure compliance with the CWA.  *See id.*  At a minimum, NPDES permits must include technology-based pollution limitations, any more stringent limitations necessary to meet water quality standards in the receiving water, and pollution discharge monitoring and reporting requirements.  *See id.* (citing 33 U.S.C. §§ 1311, 1318, 1342).

**C.      State of Idaho Permitting Requirements for Suction Dredging**

9.      In addition to obtaining an NPDES permit, dredgers in the State of Idaho must also obtain a permit from the Idaho Department of Water Resources ("IDWR") under the Stream Channel Protection Program, and may be required to obtain approval from the Idaho Department of Lands when dredging in state-designated navigable streams.  *See* Compl., ¶ 35 (Dkt. 1) (citing I.C. § 42-3801, *et seq.*).  The IDWR's mining instructions notify dredgers of the need to obtain an NPDES permit through the EPA.  *See id.* at ¶ 37 (citing *Stream Channel Alteration by Recreational Mining Activities:  IDWR Instructions for 2018*, IDWR (Rev. Jun. 22, 2018), p. 1).

10.      The IDWR approved the *South Fork Clearwater River Plan – Comprehensive State Water* Plan in 2004, designating the South Fork Clearwater River as a State Recreational River under Idaho Code § 42-1735A.  *See id.* at ¶ 38.  The plan limits/prohibits certain activities (including recreational dredge mining) to preserve water quality and/or wildlife habitat, and requires that dredge sites be inspected by the IDWR with a fisheries biologist.  S*ee id.* at ¶ 38.

**D.      ICL, Mr. Poe, and the South Fork Clearwater River**

11.      Since 2005, ICL has devoted time and resources every year to protect and restore water quality and fisheries throughout the rivers and streams of Idaho, including the South Fork

Clearwater River watershed. *See* ICL's Opp. to MTD p. 5 (Dkt. 20); *See also* Oppenheimer Decl., ¶¶ 19-47 (Dkt. 20-16).

12.      Defendant Shannon Poe is a miner and the Chief Executive Officer and/or President of the American Mining Rights Association ("AMRA"). *See* Compl., ¶ 56 (Dkt. 1). AMRA's website lists four AMRA mining claims in north Idaho totaling 80 acres, including the South Fork Clearwater River. *See id.*

#### Mr. Poe's 2014 Suction Dredge Activity and EPA's Notice of Violation

13.      In 2014, Mr. Poe applied for and received approval from IDWR to suction dredge mine in Idaho for the 2014 season. *See id*. at ¶ 54. However, he did not apply for or receive an NPDES permit authorizing him under the CWA to suction dredge mine in Idaho in 2014. *See id.*

14.      From July 14, 2014 to August 15, 2014 (the 2014 dredge season), Mr. Poe operated a suction dredge and discharged sediment and/or other pollutants into the South Fork Clearwater River on more than one day. *See id*. at ¶ 55. Mr. Poe admitted to dredging on Idaho rivers in 2014, including 13 days on the South Fork Clearwater River in online posts. *See id.* at ¶ 57. On August 16, 2014, Mr. Poe wrote an online post, recognizing the necessity of obtaining an NPDES permit and his defiance to do so. *See id.* at ¶ 59.

15.      Following the 2014 dredging season, on or around October 17, 2014, Mr. Poe received a notice from the EPA, notifying him that he was in violation of the CWA by operating a suction dredge and discharging pollutants into the South Fork Clearwater River without an NPDES permit. *See* Mem. ISO MTD, p. 7 (Dkt. 17-1) (citing Ex. 1, Att. A to Poe Decl. (Dkt. 17-2)). The EPA requested information from Mr. Poe for each day that a dredge was operated on the South Fork Clearwater River in July and August of 2014. *See id.*

16.      On November 13, 2014, Mr. Poe's attorney responded to the EPA, citing case law holding that dredge operations did not result in a discharge of pollutants and, therefore, Mr.

Poe's operations did not require an NPDES permit under the CWA.  *See* Mem. ISO MTD, pp. 7-8 (Dkt. 17-1) (citing Ex. 1, Att. B to Poe Decl. (Dkt. 17-2)).  The EPA never responded and did not pursue enforcement in 2014 or later.  *See* Poe Decl., ¶ 7 (Dkt. 17-2).

Mr. Poe's Suction Dredges in 2015

17.     In 2015, Mr. Poe obtained approval from the IDWR to suction dredge mine in Idaho during the 2015 season.  *See* ICL's Compl., ¶ 60 (Dkt. 1).  Mr. Poe operated a suction dredge on the South Fork Clearwater River in 2015 on one or more days without applying for or receiving an NPDES permit for that year.  *See id.* at ¶ 61.

18.     In July 2015, the Forest Service performed site inspections on the South Fork Clearwater River.  *See* Ex. G to Oppenheimer Decl. (Dkt. 20-23).  The Forest Service prepared and attempted to deliver notices of noncompliance to Mr. Poe while he was dredging on the South Fork Clearwater River.  *See* Opp. to MTD p. 6 (Dkt. 20) (citing Ex. G to Oppenheimer Decl. (Dkt. 20-23)).

19.     In August 2015, Mr. Poe admitted dredging on the South Fork Clearwater River in an online post.  *See* Compl., ¶ 62 (Dkt. 1).  In August and September 2015, Mr. Poe made several online posts discussing standing up to the EPA and the Forest Service while dredging. *See id.* at ¶¶ 63-64.

ICL's 2016 Notice of Intent to Sue and Follow-Up Notices in 2017 and 2018

20.     In May 2016, ICL sent Mr. Poe a written notice letter ("2016 Notice of Intent to Sue") by certified mail, advising him that ICL intended to initiate a CWA citizen suit against him if he continued to suction dredge in Idaho without an NPDES permit.  *See id.* at ¶ 65; *see also* Ex. 1, Att. C to Poe Decl. (Dkt. 17-2) ("Given your involvement with AMRA, your past dredging, and your public statements, ICL reasonably believes that you will continue to suction

dredge mine in the South Fork Clearwater River and/or other Idaho rivers and streams without a valid NPDES permit, in violation of the Clean Water Act.").

21.     Mr. Poe received ICL's letter and responded in a June 14, 2016 letter, stating: "I have no plans, or intent to dredge the SF Clearwater this year, and do not intend to dredge in future years without the appropriate permits." *See* Compl., ¶ 66 (Dkt. 1); *see also* Poe Decl., ¶ 10 (Dkt. 17-2); Ex. C to Oppenheimer Decl. (Dkt. 20-19).

22.     Mr. Poe did not operate a suction dredge on the South Fork Clearwater River, or anywhere in Idaho, in 2016 or 2017.  *See* Poe Decl., ¶¶ 11, 13 (Dkt. 17-2).

23.     Prior to each dredging season in 2017 and 2018, ICL mailed (via regular mail) and emailed follow-up notice letters, informing Mr. Poe of ICL's continuing intent to file suit if he operated a suction dredge in Idaho again without an NPDES permit.  *See* Compl., ¶ 67 (Dkt. 1); *see also* Ex. 1, Atts. D, E to Poe Decl. (Dkt. 17-2).  Mr. Poe does not recall ever receiving the 2017 notice letter, and only received the 2018 notice letter upon returning to his California residence *after* the 2018 dredge season on the South Fork Clearwater River.  *See* Poe Decl., ¶¶ 12, 15 (Dkt. 17-2).

<u>Mr. Poe Suction Dredges in 2018</u>

24.     In May 2018, Mr. Poe obtained approval from the IDWR to suction dredge in Idaho for the 2018 season. *See* Compl., ¶ 68 (Dkt. 1); *see also* Ex. D to Oppenheimer Decl. (Dkt. 20-20).  Again, however, he never applied for or received an NPDES permit authorizing him under the CWA to suction dredge mine in Idaho in 2018.  *See* Compl., ¶ 68 (Dkt. 1).

25.     Mr. Poe operated a suction dredge on the South Fork Clearwater River for one or more days.  *See id*. at ¶¶ 70, 83; *see also* Poe Decl., ¶ 17 (Dkt. 17-2).

26.     In online posts, Mr. Poe admitted to dredging on the South Fork Clearwater River on multiple days during the 2018 season and admitted to purposefully failing to obtain an

NPDES permit.  *See* Compl., ¶¶ 73-82 (Dkt. 1).  Mr. Poe also admitted he planned to continue dredging through August 15, 2018, and in future years. *See id.*

**E.     ICL Sues Mr. Poe and Mr. Poe Moves to Dismiss**

27.     On August 10, 2018, ICL initiated this action, alleging that Mr. Poe was committing ongoing violations of the CWA by failing to obtain an NPDES permit while dredging and discharging sediment and other pollutants contributing to the water quality impairment in the South Fork Clearwater River on multiple occasions in 2014, 2015, and 2018. *See* Compl., ¶¶ 98-100 (Dkt. 1); *see also* Opp. to MTD, p. 7 (Dkt. 20).  ICL alleges that these violations were/are continuing and are reasonably likely to recur in 2018 and in future years.  *See id.*

28.     On December 21, 2018, Mr. Poe filed the at-issue Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1), arguing that (1) this Court lacks subject matter jurisdiction because, in part, ICL's 2017 and 2018 notice letters were not sent via certified mail as required by the CWA and the implementing regulations; and (2) ICL lacks standing to bring this suit in the first instance.  *See generally* Mem. ISO MTD, pp. 1-2, 9-20 (Dkt. 17-1).

## II. <u>LEGAL STANDARD</u>

Mr. Poe moves to dismiss ICL's Complaint under Federal Rule of Civil Procedure 12(b)(1), claiming that the Court lacks subject matter jurisdiction based on his notice and standing arguments.  Federal Rule of Civil Procedure 12(b)(1) permits a challenge to the authority of the federal court to consider a dispute because "[f]ederal courts are courts of limited jurisdiction."  *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994); *cf.* Fed. R. Civ. P. 12(b)(1) (requiring dismissal of complaint where court lacks subject matter jurisdiction).  Thus, a court is "presumed to lack jurisdiction in a particular case unless the contrary affirmatively appears," *Stock W., Inc. v. Confederated Tribes of the Colville Reservation*, 873

F.2d 1221, 1225 (9th Cir. 1989), and the plaintiff bears the burden of establishing that such

jurisdiction exists, *KVOS, Inc. v. Associated Press*, 299 U.S. 269, 278 (1936).  When the issue of

subject matter jurisdiction is raised, it must be resolved before the Court may consider the merits

of the plaintiff's claims.  *See, e.g.*, *Sinochem Int'l Co. v. Malay. Int'l Shipping Corp.*, 549 U.S.

422, 430-31 (2007).[2]

## III. DISCUSSION

**A.    ICL Provided Mr. Poe with Adequate Notice**

ICL contends that, because the EPA has not pursued any CWA enforcement action

against Mr. Poe since sending him the 2014 notice of violation for dredging on the South Fork

Clearwater River without an NPDES permit (*see supra*), the CWA's citizen suit provision is

"particularly important here."  Opp. to MTD, p. 8 (Dkt. 20).  The significance is self-evident, as

it is through the CWA's citizen suit provision that ICL brings this action.

Relevant here, the CWA requires citizens to provide 60 days' notice to the alleged

violator prior to filing suit.  *See* 33 U.S.C. § 1365(b)(1)(A).  As to the "notice" itself, EPA

regulations require service by certified mail (along with copies to the EPA Administrator, the

EPA Regional Administrator, and the head of the water pollution control agency in the state

where the CWA violation is alleged to have occurred), as well as:

> sufficient information to permit the recipient to identify the specific standard,
> limitation, or order alleged to have been violated, the activity alleged to constitute

---

[2]    Dismissal under Federal Rule of Civil Procedure 12(b)(1) can be brought either facially or factually.  In a facial attack, the challenger asserts that the allegations contained within a complaint are insufficient on their face to invoke federal jurisdiction.  *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004).  In a factual attack, the challenger disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction. *Id.*  ICL correctly points out that, despite referencing Federal Rule of Civil Procedure 12(b)(1), Mr. Poe's Motion to Dismiss does not identify what kind of motion he is making under the Rule – either a facial or factual attack.  *See* Opp. to MTD, p. 2 (Dkt. 20).  As reflected by the parties' briefing, any distinction in these respects is immaterial to the Court's handling of the underlying issues driving Mr. Poe's dismissal arguments.

a violation, the person or persons responsible for the alleged violation, the location of the alleged violation, the date or dates of such violation, and the full name, address, and telephone number of the person giving notice.

*See id.*; *see also* 40 C.F.R. §§ 135.2(a)(1), 135.3.

Mr. Poe argues subject matter jurisdiction is lacking in this case because ICL failed to meet the CWA's notice requirement in three ways: (1) the 2016 Notice of Intent to Sue relies on wholly past alleged violations, which the 2017 and 2018 follow-up notices incorporated by reference; (2) the 2017 and 2018 follow-up notices were not sent by certified mail as required by the regulations, Mr. Poe did not receive the 2018 follow-up notice until after ICL filed this lawsuit, and ICL filed suit less than 60 days after sending the 2018 follow-up notice; and (3) all three notices lack specificity as to the location of the alleged violations. *See* Mem. ISO MTD, p. 11 (Dkt. 17-1) (citing *Ctr. for Biological Diversity v. Marina Point Dev. Co.*, 566 F.3d 794, 800 (9th Cir. 2009) (properly sent or formulated 60-day notice is "jurisdictional necessity")). The Court disagrees.

Significantly, CWA notice requirements are "strictly construed," but the applicable regulations do not require "that plaintiffs list every specific aspect or detail of every alleged violation" – rather, it is "reasonable specificity" that is required. *S.F. Baykeeper v. Tosco Corp.*, 309 F.3d 1153, 1157-58 (9th Cir. 2002) (citation omitted). "The key language in the notice regulation is the phrase 'sufficient information to permit the recipient to identify' the alleged violations and bring itself into compliance." *Id*. at 1158 (quoting 40 C.F.R. § 135.3(a)). "Notice is sufficient if it is specific enough to give the accused . . . the opportunity to correct the problem." *Id*. (internal quotation marks and citation omitted). For the following reasons, ICL has complied with these requirements.

After reviewing the record of this case, the Court concludes that it is incorrect to suggest that ICL's 2016 Notice of Intent to Sue improperly relied solely on past alleged violations. Considered in toto, the 2016 Notice of Intent to Sue notified Mr. Poe directly that:

- "Unless you take the steps necessary to remedy your *ongoing* CWA violations (including by obtaining any required NPDES permit(s) before engaging in any *further* suction dredge mining in Idaho by complying with the terms of the permit(s)), ICL intends to file suit in U.S. District Court following the expiration of the 60-day statutory notice period, seeking injunctive relief, civil penalties, and other relief for your past and *ongoing* CWA violations, and for any additional similar violations identified subsequently."

- "Based on reasonable investigation to date and publicly available information, ICL is informed and believes that you have violated, *and are continuing to violate*, Section 301 of the Clean Water Act by conducting suction dredge mining and discharging sediment and other pollutants to rivers and streams in Idaho without an NPDES permit, including (but not limited to) rivers and streams in the Clearwater River watershed."

- "ICL is also informed and reasonably believes that your Clean Water Act violations *are likely to continue*. You are the president of the American Mining Rights Association (AMRA) which *has scheduled an event* called the "'Gone Mining Idaho Dredge Trip on the Clearwater" from July 15 to August 15, 2016. Given your involvement with AMRA, your past dredging, and your public statements, ICL reasonably believes that *you will continue* to suction dredge mine in the South Fork Clearwater River and/or other Idaho rivers and streams without a valid NPDES permit, in violation of the Clean Water Act."

- "ICL further notes that your past *and ongoing violations* of the Clean Water Act are willful, knowing, and deliberate."

- "We are providing this letter not only to comply with the CWA statutory notice requirement, 33 U.S.C. § 1365(b), but also in the hope of preventing *your future violations* of the Clean Water Act. If any information in this letter is inaccurate, you should inform us immediately."

Ex. 1, Att. C to Poe Decl. (Dkt. 17-2) (emphasis added).

Mr. Poe properly acknowledges that a plaintiff (here, of course, ICL) "must have a good faith allegation of continuing or intermittent violations for a court to have jurisdiction over a suit." Mem. ISO MTD, p. 10 (Dkt. 17-1) (citing *Gwaltney of Smithfield v. Chesapeake Bay Found.*, 484 U.S. 49, 64-67 (1987)). The Ninth Circuit has held that intermittent pollution

violations are "ongoing" when either: (1) violations "continue on or after the date the complaint is filed," or (2) "by adducing evidence from which a reasonable trier of fact could find a continuing likelihood of a recurrence in intermittent or sporadic violations." *NRDC v. Southwest Marine, Inc.*, 236 F.3d 985, 998 (9th Cir. 2000) (internal quotation marks and citations omitted). Here, ICL made good faith allegations of continuing/intermittent CWA violations based not only on Mr. Poe's history of suction dredging on the South Fork Clearwater River, but also his public statements about his past dredging, about his ongoing dredging, and about his plans for dredging in future years (including statements about defying the EPA and the CWA). *See supra*. Indeed, it could reasonably be said that Mr. Poe was intentionally advertising to the world not just the fact of his prior suction dredging activities but also the fact of his intended future suction dredging activities. That Mr. Poe ultimately resumed suction dredging activities on the South Fork Clearwater River in 2018 without any NPDES permit substantiates ICL's concerns about Mr. Poe's "continuing" and "ongoing" violations back in 2016. *See Sierra Club v. Union Oil Co. of Cal.*, 853 F.2d 667, 671 (9th Cir. 1988) (agreeing that risk of ongoing violations must be "completely eradicated" for citizen suit to be precluded, holding: "Intermittent or sporadic violations do not cease to be ongoing until the date when there is no real likelihood of repetition.") (internal quotation marks and citations omitted).

In short, Mr. Poe's cessation of suction dredging activities on the South Fork Clearwater River in 2016 and 2017 proved to be only temporary; on the record now before the Court, they do not upend the fact of Mr. Poe's (borne out) continuing and/or intermittent suction dredging activities on the South Fork Clearwater River without any NPDES permit.[3]

---

[3] The Court is aware that time can pass and circumstances can change between the sending of a notice to sue and the filing of a lawsuit. This Decision addresses only whether ICL's 2016 Notice of Intent to Sue reaches Mr. Poe's 2018 conduct. To be clear, it does.

Second, even though the 2017 and 2018 follow-up notices were not sent by certified mail, the 2016 Notice of Intent to Sue was sent by certified mail and Mr. Poe received the same. *See supra*. In other words, whether the two follow-up notices were sent by certified mail is immaterial for the purposes of ICL's claims against Mr. Poe – premised, as they are, upon the 2016 Notice of Intent to Sue. Said another way, had ICL never sent the 2017 and 2018 follow-up notices, its citizen suit against Mr. Poe under the CWA would still exist. Viewed thusly, the fact that neither follow-up notice was sent by certified mail does not matter; they were simply "reminders," tethered to the already CWA-compliant 2016 Notice of Intent to Sue. [4]

Third, ICL's 2016 Notice of Intent to Sue reasonably specified the nature and location of Mr. Poe's alleged violations, and said in relevant part:

- "Based on reasonable investigation to date and publicly available information, ICL is informed and believes that you have violated, and are continuing to violate, Section 301 of the Clean Water Act by conducting suction dredge mining and discharging sediment and other pollutants to rivers and streams in Idaho without an NPDES permit, *including (but not limited to) rivers and streams in the Clearwater River watershed.*"

- "ICL is also informed and reasonably believes that your Clean Water Act violations are likely to continue. You are the president of the American Mining Rights Association (AMRA) which has scheduled an event called the "'Gone Mining Idaho Dredge Trip *on the Clearwater*" from July 15 to August 15, 2016. Given your involvement with AMRA, your past dredging, and your public statements, ICL reasonably believes that you will continue to suction dredge mine in the *South Fork Clearwater River* and/or other Idaho rivers and streams without a valid NPDES permit, in violation of the Clean Water Act."

- "ICL further notes that your past and ongoing violations of the Clean Water Act are willful, knowing, and deliberate. You have been notified multiple times of your legal obligation to obtain an NPDES permit to such dredge mine in Idaho (including by the U.S. Environmental Protection Agency on or around October 17, 2014, by the U.S. Forest Service on or around July 22, 2015, and by IDWR

---

[4] Because the 2017 and 2018 follow-up notices are effectively disconnected from ICL's claims against Mr. Poe (at least insofar as the CWA's notice requirements are concerned) (*see supra*), Mr. Poe's satellite arguments concerning them – namely, that he never received the follow-up notices (either at all or until it was too late), and that this action was filed less than 60 days after ICL sent the 2018 follow-up notice – are without merit.

in the state Recreational Mining Permits issued to you in 2014 and 2015). Yet you have never obtained an NPDES permit for suction dredge mining *on the South Fork Clearwater River* or anywhere else in Idaho."

Ex. 1, Att. C to Poe Decl. (Dkt. 17-2) (emphasis added).

This information was reasonably specific so that Mr. Poe could understand ICL's allegations of law-breaking (suction dredging on the South Fork Clearwater River without any NPDES permit) and how he could correct the problem (by not dredging on the South Fork Clearwater River again without an NPDES permit). Mr. Poe even wrote back to ICL in June 2016, stating: "I have no plans, or intent to dredge the SF Clearwater this year, and do not intend to dredge in future years without the appropriate permits." Poe Decl., ¶ 10 (Dkt. 17-2); Ex. C to Oppenheimer Decl. (Dkt. 20-19).[5] Regardless of whether Mr. Poe's response was intentionally ambiguous in his statement "without the appropriate permits," given his position that no permit could lawfully be required, his response otherwise confirms that he understood the alleged violations and how to avert them in the future. *See* Poe Decl., ¶¶ 11, 13 (Dkt. 17-2) (Mr. Poe indicating that he did not operate a suction dredge on South Fork Clearwater River, or anywhere in Idaho, in 2016 and 2017). Simply put, Mr. Poe's response to ICL's 2016 Notice of Intent to Sue admits that he was adequately advised, with reasonable specificity, of the alleged CWA violations. *See NRDC v. Southwest Marine, Inc.*, 236 F.3d at 997 (considering defendant's response to notice in determining adequacy of notice itself) (citing *Atlantic States Legal Found., Inc. v. Stroh Die Casting Co.*, 116 F.3d 814, 820 (7th Cir. 1997) (concluding that notice was sufficiently specific where defendant, after receiving notice, took immediate steps to cure problems identified in notice letter)).

---

[5] Whether ICL's 2016 Notice of Intent to Sue adequately spoke to hypothetical CWA violations in other rivers in Idaho (not the South Fork Clearwater River) is more problematic and not resolved here. Suffice it to say, it sufficiently identified Mr. Poe's alleged CWA violations *on the South Fork Clearwater River*.

Accordingly, the Court finds that ICL's 2016 Notice of Intent to Sue provided Mr. Poe with reasonable specificity of the basis for its claim and, thus, complied with the CWA and its implementing regulations.

**B.      ICL Has Standing**

Mr. Poe argues that "ICL's Complaint fails to meet Article III Standing."  Mem. ISO MTD, p. 14 (Dkt. 17-1).  Article III of the United States Constitution limits judicial power to deciding cases and controversies.  This limitation, known as the standing doctrine, requires that a plaintiff have a "personal stake in the outcome of the controversy . . . to warrant his invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his behalf." *Warth v. Seldin*, 422 U.S. 490, 498-99 (1975).  A plaintiff must establish that:

> [He] is under threat of suffering 'injury in fact' that is concrete and particularized; the threat must be actual and imminent, not conjectural and hypothetical; it must be fairly traceable to the challenged action of the defendant; and it must be likely that a favorable judicial decision will prevent or redress the injury.

*Jayne v. Sherman*, 706 F.3d 994, 999 (9th Cir. 2013); *see also Friends of the Earth, Inc. v. Laidlaw Envtl. Serv., Inc.*, 528 U.S. 167, 180-81 (2000).

> An association has standing to bring suit on behalf of its member when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted, nor the relief requested requires the participation of individual members in the lawsuit.

*Friends of the Earth*, 528 U.S. at 181; *see also Summers v. Earth Island Inst.*, 555 U.S. 488, 494 (2009) ("While generalized harm to the forest or the environment will not alone support standing, if that harm in fact affects the recreational or even the mere esthetic interest of the plaintiff, that will suffice.").

ICL's Complaint contains specific allegations addressing each of the above-referenced standing prongs.  *See* Compl., ¶¶ 9-15, 40-53, 91-102, Prayer for Relief (Dkt. 1).  But ICL goes further, including supporting declarations responding to Mr. Poe's Motion to Dismiss in an effort

to establish that its members frequently and extensively use the South Fork Clearwater River and their aesthetic and recreational values have been and will be lessened by Mr. Poe's suction dredging there. *See generally* Inghram Decl. (Dkt. 20-15); Oppenheimer Decl. (Dkt. 20-16). For example:

- Janice Inghram is a long-time ICL member who has always lived near the South Fork Clearwater River and has regularly visited and fly fished the South Fork Clearwater River. *See* Inghram Decl., ¶¶ 1-11 (Dkt. 20-15). In recent years, she has frequently encountered suction dredge mining during visits to the South Fork Clearwater River. *See id.* at ¶ 12 ("I have seen many dredge miner encampments on or near the banks of the South Fork. I have also seen many miners operating dredges and watched the brown plumes of sediment they discharge to the river. I have seen suction dredging encampments and dredging in the South Fork near Mile Marker 39 on Highway 14, which I believe to be where Mr. Poe and others were dredging in 2014, 2015, and 2018 . . . . I encountered the dredge operations near Mile Marker 39 in 2014, 2015, and 2018 about four times each year.").

- "It saddens me to see this suction dredge mining in the river I love so much. Seeing the plume of sediment drifting behind a dredge reminds me of the 1940s and 1950s when the South Fork ran chocolate. I believe that sediment discharges from Mr. Poe's suction dredge are degrading water quality in the South Fork and harming the fish, birds, and wildlife that depend on the river, which harms my interests in preserving these values and ensuring the ecological integrity of the South Fork." *Id.* at ¶ 13.

- "Because of the disturbing sediment plume and other noise and activity I have witnessed at dredge sites, including sites near Mile Marker 39, driving along the South Fork is less enjoyable to me during dredge season. Dredging encampments and dredging operations, including Mr. Poe's, disrupt the ecosystem, disturb fish and wildlife, and take away from the scenic beauty I enjoy on the South Fork. As a result, during dredge season, my husband and I drive through the South Fork without stopping as much as we would like to enjoy nature, gaze at and photograph the South Fork, or look for and photograph birds and wildlife." *Id.* at ¶ 14; *see also id.* at ¶ 15-17 (discussing additional harms).

- "A court decision ordering Mr. Poe not to engage in suction dredge mining unless he obtains a Clean Water Act permit will help redress these harms. I have read news articles in the Idaho County Free Press and the Lewiston Tribune featuring Mr. Poe. Mr. Poe has been very vocal that he will not obtain a Clean Water Act permit. Therefore, if the Court orders him to either get a permit or not dredge, Mr. Poe might stop dredging on the South Fork which will alleviate the harms I experience from his dredging." *See id.* at ¶ 19.

**MEMORANDUM DECISION AND ORDER - 16**

- Jonathan Oppenheimer regularly visits the South Fork Clearwater River for both personal and professional reasons as an ICL staff member. *See* Oppenheimer Decl., ¶¶ 3-18 (Dkt. 20-16). He cares deeply about the protection and restoration of the South Fork Clearwater River and likes to enjoy nature when he is there. *See id.*

- "From 2008 to 2016, I served as ICL's representative on the Clearwater Basin Collaborative, an initiative of U.S. Senator Mike Crapo to bring together stakeholders in the Clearwater to find common ground and advance solutions to protect sensitive resources, create jobs, and restore public lands and waters. I regularly visit the Clearwater for work to attend stakeholder meetings, meet with local government officials, conduct site visits, investigate report of unauthorized use or occupancy of public lands." *Id.* at ¶ 17.

- "Mr. Poe's unlawful dredging without an NPDES permit harms my personal interests and ICL's interests. Operating a suction dredge discharges sediment and creates turbid plumes that disturbs and disrupts habitat for fish and for their prey. This is particularly concerning on the South Fork, because it is 'impaired' due to having too much sediment pollution, which fills the interstitial spaces between rocks, gravels, and cobbles. These small spaces in between rocks are important for hiding cover for fish and their prey and are also important as they provide the locations for spawning fish. Too much sediment in a stream impairs fish habitat and reduces fish populations and can lead to local extirpation and/or extinction." *Id.* at ¶¶ 48-49; *see also id.* at ¶¶ 50-56 (discussing additional negative impacts of suction dredge mining on South Fork Clearwater River).

- "For these reasons, my ability to engage in activities that I enjoy on the South Fork is directly impacted by Poe's unpermitted dredging. If Poe's unpermitted dredge mining continues in the South Fork, I may start avoiding or reducing the amount of time I would otherwise like to spend recreating on, fishing, and enjoying the South Fork." *Id.* at ¶ 57.

- "A court decision ordering Mr. Poe not to dredge unless he obtains and complies with an NPDES permit will help redress these harms. If Mr. Poe remains unwilling to obtain and comply with an NPDES permit and prefers not to dredge in Idaho, then this will help to protect clean water, fish habitat, and other resources that I care about and that ICL and its members care about and which make my experiences on the South Fork enjoyable. Or, if Mr. Poe is willing to apply for, receive, and comply with an NPDES permit(s) before dredging again, then this would be an improvement as well. NPDES permits are designed to protect water quality by imposing pollution limits, monitoring, and reporting requirements, and other restrictions on activities that discharge pollutants to water. Adherence to the requirements of an NPDES permit will reduce or minimize the negative effects of his activities. It would reduce impacts to other recreational users of the river, would leave the river cleaner,

and would better safeguard the environment, fisheries, and other sensitive resources. *See id*. at ¶¶ 58-59.

- "Thus, by ordering Mr. Poe to obtain and comply with an NPDES permit, he either will not dredge, or will dredge by following more restrictions to protect water quality, stream beds, streambanks, and other sensitive resources, which protects the values I and ICL and its members care about. Further, Mr. Poe will have to monitor and report to EPA, which ICL uses to ensure compliance with permit requirements and environmental protection, and to consider in the development of future regulations, restrictions, or prohibitions relative to mining activities." *Id*. at ¶ 62.

- "Additionally, a Court order imposing CWA penalties on Mr. Poe for his unlawful past and ongoing dredging without an NPDES permit will redress my and ICL's injuries. CWA penalties are intended to deter the violator and other would be violators from unlawful activity. Mr. Poe has a history of dredging without an NPDES permit and of encouraging others to do so. My interests, and ICL's interests, have been harmed and continued to be harmed by Mr. Poe's unlawful dredging, which he has continued despite warnings from EPA, ICL, and others that he needs an NPDES permit. Hopefully, by imposing financial penalties on Mr. Poe, he will be deterred from dredging without complying with the CWA, he might stop encouraging others to dredge in Idaho without complying with the CWA, and others might be deterred from dredging without complying with the CWA." *Id*. at ¶ 65.

These allegations are sufficient allegations of injury in fact – they allege that ICL's members derive recreational and aesthetic benefit from their use of the South Fork Clearwater River (including near Mr. Poe's dredging and other locations affected by it); and their enjoyment has been altered and their use has been curtailed because of their concerns about the damaging impacts of Mr. Poe's suction dredge mining. This is enough to support organization standing. *See Cottonwood Envtl. L. Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075, 1081 (9th Cir. 2015) ("Unlike Bensman's affidavit in *Summers*, these declarations sufficiently establish 'a geographic nexus between the individual asserting the claim and the location suffering an environmental impact.'") (quoting *W. Watersheds Project v. Draayenbrink*, 632 F.3d 472, 485 (9th Cir. 2011)).

The injury is also fairly traceable to the challenged activity. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (there must be "a causal connection between the injury and

the conduct complained of – the injury has to be 'fairly . . . trace[able] to the challenged action of the defendant, and not . . . the[e] result [of] the independent action of some third party not before the court.'") (quoting *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 41-42 (1976)). ICL presented evidence that Mr. Poe discharged sediment into the South Fork Clearwater River while suction dredge mining in 2014, 2015, and 2018 without an NPDES permit; these discharges cause or contribute to the kinds of injuries ICL (through members like Inghram and Oppenheimer) suffers on the South Fork Clearwater River, including injuries due to decreased water quality, altered streambanks and riverbeds, and disturbance of fish, birds, and wildlife. *See supra*. Such evidence is sufficient to demonstrate that ICL's injuries were fairly traceable to Mr. Poe's conduct. *See NRDC v. Southwest Marine, Inc.*, 236 F.3d at 995 ("[T]he threshold requirement of traceability does not mean that plaintiffs must show to a scientific certainty that defendant's effluent caused the precise harm suffered by the plaintiffs in order to establish standing. To satisfy this requirement, rather than pinpointing the origins of particular molecules, a plaintiff must merely show that a defendant discharges a pollutant that causes or contributes to the kinds of injuries alleged in the specific geographic area of concern.") (internal quotation marks and citations omitted).[6]

_____

[6] Mr. Poe suggests that, with an IDWR permit for the years that he dredged, the absence of an NPDES permit is inconsequential and, therefore, ICL's alleged injuries are not traceable to the fact that he did not first secure an NPDES permit. *See* Mem. ISO MTD, pp. 18-19 (Dkt. 17-1) ("ICL fails to show how its members' recreational activities and the aesthetic values are diminished by Mr. Poe's suction dredge mining activities as opposed to the Idaho and EPA programs that authorize mining on the South Fork Clearwater River. . . . Thus, Mr. Poe's mining activity, which conformed to the IDWR pert cannot be traced to ICL members' injuries."). However, even if Mr. Poe complied with his IDWR permits (which ICL disputes), the IDWR and NPDES permits are not identical, as there is some overlap but also numerous differences. *See, e.g.*, *id.* at pp. 5-7 (*Mr. Poe* discussing differences between NPDES General Permit and "Idaho's authorization"); *see also* Oppenheimer Decl., ¶¶ 39-40 (Dkt. 20-16) ("I have read and am very familiar with the 2018 NPDES General Permit and IDWR's 2018 permit for the South Fork. Compared to IDWR's permit, the NPDES General Permit: imposes stricter limits on the number of dredge operations allowed on the South Fork each season; requires dredges to be

Finally, in either enjoining Mr. Poe from future discharges into the South Fork Clearwater River without an NPDES permit or imposing civil penalties on Mr. Poe, ICL has demonstrated that a favorable decision would redress its injuries. *See NRDC v. Southwest Marine, Inc.*, 236 F.3d at 995 ("A plaintiff who seeks injunctive relief satisfies the requirement of redressability by alleging a continuing violation or the imminence of a future violation of an applicable statute or standard.") (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 108 (1998)); *see also Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 186 (2000) (civil penalties "encourage defendants to discontinue current violations and deter them from committing future ones, [thus] afford[ing] redress to citizen plaintiffs who are injured or threatened with injury as a consequence of ongoing unlawful conduct.").

The allegations within ICL's Complaint adequately allege a sufficient injury in fact and, in turn, the allegations sufficiently trace the injury to Mr. Poe's challenged conduct. The alleged injury is redressable by enjoining Mr. Poe from violating the CWA and imposing civil penalties as a deterrent. ICL therefore has Article III standing. Obviously, ICL's allegations may be tested during the course of this action, but they are sufficient to establish ICL's standing to proceed.

---

spaced farther apart from each other; limits the amount of material a miner can process per day; and includes NTU-based turbidity effluent limits that apply to dredgers on the South Fork *in addition* to the effluent limit required by both EPA and IDWR (no visible plume beyond 500 feet). These additional or more stringent requirements in the NPDES General Permit help prevent environmental degradation caused by suction dredge mining. The General Permit also requires permittees to monitor their turbidity daily, keep records in logs, and submit results to EPA in an annual report, while IDWR does not require this. General Permit applications are due 60 days prior to dredging (whereas IDWR permits are due 30 days prior). While both permits require dredgers to display identification on their dredges, the General Permit also requires displaying identification on the dredger's parked vehicle. These unique requirements of the NPDES General Permit allow ICL to determine earlier in the season who intends to dredge, to identify dredgers in the field, and to review dredger monitoring reports for compliance.").

## IV.  <u>ORDER</u>

Based on the foregoing, IT IS HEREBY ORDERED that Defendant Shannon Poe's Motion to Dismiss Plaintiff Idaho Conservation League's Complaint (Dkt. 17) is DENIED.  By separate notice, the Court will set a scheduling conference to address the case management deadlines moving forward.

DATED: September 30, 2019

Ronald E. Bush
Chief U.S. Magistrate Judge