## UNITED STATES DISTRICT COURT
## DISTRICT OF IDAHO

| | |
|---|---|
| IDAHO CONSERVATON LEAGUE,<br><br>　　　　Plaintiff,<br><br>vs.<br><br>SHANNON POE,<br><br>　　　　Defendant. | Case No.: 1:18-cv-353-REB<br><br>**MEMORANDUM DECISION AND ORDER RE:**<br><br>**IDAHO CONSERVATION LEAGUE'S MOTION FOR SUMMARY JUDGMENT ON LIABILITY**<br>**(Dkt. 38)**<br><br>**SHANNON POE'S MOTION FOR SUMMARY JUDGMENT**<br>**(Dkt. 39)** |

Pending before the Court is Plaintiff Idaho Conservation League's Motion for Summary Judgment on Liability (Dkt. 38) and Defendant Shannon Poe's Motion for Summary Judgment (Dkt. 39). Having carefully considered the record, participated in oral argument, and otherwise being fully advised, the Court enters the following Memorandum Decision and Order:

## I.  RELEVANT BACKGROUND

The pertinent facts that now frame the legal issues involved in this case (and as presented in the parties' cross-motions for summary judgment) are largely undisputed[1] – namely, that Mr. Poe suction dredge mined 42 days on the South Fork Clearwater River during the 2014, 2015,

---

[1]  Within its September 30, 2019 Memorandum Decision and Order denying Defendant Shannon Poe's Motion to Dismiss, the Court generally discussed the characteristics of the South Fork Clearwater River; recreational suction dredge mining and National Pollutant Discharge Elimination System ("NPDES") permit requirements under the Clean Water Act ("CWA"); Idaho's permitting requirements for suction dredging; Mr. Poe's suction dredge activity on the South Fork Clearwater River without an NPDES permit in 2014, 2015, and 2018; and Plaintiff Idaho Conservation League's ("ICL") correspondence to Mr. Poe in 2016, 2017, and 2018 advising him of its intention to initiate a CWA citizen suit against him if he continued to suction dredge in Idaho without an NPDES permit. *See generally* 9/30/19 MDO, pp. 1-8 (Dkt. 26). This backdrop, while important for context, will not be repeated here.

**MEMORANDUM DECISION AND ORDER - 1**

and 2018 dredge seasons (running from July 15 to August 15 each year), without ever obtaining an NPDES permit under Section 402 of the CWA. ICL argues that Mr. Poe violated the CWA each time he operated a suction dredge on the South Fork Clearwater River without an NPDES permit. Mr. Poe disagrees, countering that (1) his suction dredge mining did not add pollutants to the South Fork Clearwater River and therefore did not require an NPDES permit (or any other CWA permit) in the first instance; and (2) even if his suction dredge mining did add pollutants, those pollutants are "dredged" or "fill" material regulated exclusively under Section 404 (not Section 402) of the CWA and therefore did not require an NPDES permit.[2] This Memorandum Decision and Order confronts these positions, resolving the question of whether Mr. Poe's suction dredge mining is governed under Section 402 or Section 404 of the CWA.

## II. <u>LEGAL STANDARD</u>

Summary judgment requires a showing that, as to any claim or defense, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A principal purpose of summary judgment "is to isolate and dispose of factually unsupported claims . . . ." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). It is "not a disfavored procedural shortcut"; rather, it is the "principal tool[ ] by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources." *Id.* at 327. "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). There must be a genuine dispute as to any material fact – a fact "that may affect the outcome of the case." *Id.* at 248.

---

[2] Mr. Poe further argues that any discharges from his suction dredge mining are only "incidental fallback," making them exempt from Section 404 of the CWA in any event.

The evidence must be viewed in the light most favorable to the non-moving party, and the court must not make credibility findings. *See id.* at 255. Direct testimony of the non-movant, however implausible, must be believed. *See Leslie v. Grupo ICA*, 198 F.3d 1152, 1159 (9th Cir. 1999). However, the court is not required to adopt unreasonable inferences from circumstantial evidence. *See McLaughlin v. Liu*, 849 F.2d 1205, 1208 (9th Cir. 1988).

In deciding cross-motions for summary judgment, the court considers each party's evidence. *See Las Vegas Sands, LLC v. Nehme*, 632 F.3d 526, 532 (9th Cir. 2011); *see also Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1134 (9th Cir. 2001) ("[W]hen simultaneous cross-motions for summary judgment on the same claim are before the court, the court must consider the appropriate evidentiary material identified, and submitted in support of both motions, and in opposition to both motions, before ruling on each of them."). The court must independently search the record for factual disputes. *See Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1134 (9th Cir. 2001). Even though the filing of cross-motions for summary judgment means that both parties essentially assert that there are no material factual disputes, the Court nonetheless must decide whether disputes as to material fact are present. *See id.*

The moving party bears the initial burden of demonstrating the absence of a genuine dispute as to material fact. *See Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001). Affirmative evidence (such as affidavits or deposition excerpts) is not required to meet this burden, as the movant may simply point out the absence of evidence supporting the non-moving party's case. *See Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 532 (9th Cir. 2000). Doing so shifts the burden to the non-movant to produce evidence sufficient to support a favorable jury verdict. *See Devereaux*, 263 F.3d at 1076. The non-movant must go beyond the pleadings and show "by [his] own affidavits, or by the depositions, answers to interrogatories, or

admissions on file" that a genuine dispute of material fact exists.  *Celotex*, 477 U.S. at 324.

Where reasonable minds could differ on the material facts at issue, summary judgment should

not be granted.  *See Anderson*, 477 U.S. at 251.

### III.  DISCUSSION

The CWA prohibits the discharge of any pollutant into the waters of the United States

unless the Environmental Protection Agency ("EPA") or the Army Corps of Engineers (the

"Corps") has issued a permit authorizing the discharge.  *See* 33 U.S.C. §§ 1311(a), 1342 (EPA

and "[NPDES]" permits),[3] 1344 (Corps and "Permits for dredged and fill material").  Neither

ICL nor Mr. Poe disputes that the material passing through Mr. Poe's suction dredge and into the

South Fork Clearwater River falls within the definition of a "pollutant"[4] under the CWA; instead,

the parties dispute which agency – the EPA via Section 402 of the CWA or the Corps via Section

404 of the CWA – has authority under the CWA to permit the discharge, if any, of such

pollutants into the South Fork Clearwater River.  For the reasons that follow, the Court

concludes that the EPA and Section 402 of the CWA control the circumstances giving rise to the

instant action.

**A.**    **Mr. Poe's Suction Dredge Mining Added Pollutants to the South Fork Clearwater River, Thus Requiring an NPDES Permit Under Section 402 of the CWA**

A Section 402/NPDES permit is required if a person "(1) discharged, i.e., added (2) a

pollutant (3) to navigable waters (4) from (5) a point source."  *Comm. to Save Mokelumne River*

---

[3]  Of note, an NPDES permit is not required for discharges of dredged or fill material into
navigable waters.  *See* 33 U.S.C. § 1342(a)(1) ("*Except as provided in section[ ] . . . 1344 of this
title*, the Administrator may . . . issue a permit for the discharge of a pollutant . . . .") (emphasis
added); *see also infra* (discussing question of whether suction dredge mining is dredge or fill
activity).  The CWA defines "navigable waters" as "the waters of the United States, including
territorial seas."  33 U.S.C. § 1362(7)

[4]  The CWA provides that "pollutant" means, among other things, "dredged spoil,"
"rock," "sand," and "cellar dirt" "discharged into water."  33 U.S.C. § 1362(6).

*v. East Bay Mun. Utility Dist.*, 13 F.3d 305, 308 (9th Cir. 1993) (citing *Nat'l Wildlife Fed'n v. Gorsuch*, 693 F.2d 156, 165 (D.C. Cir. 1982)); *see also* 33 U.S.C. §§ 1311(a), 1342(a)(1), 1362(12) (CWA defining "discharge of a pollutant" as "any addition of any pollutant to navigable waters from any point source"). There is no dispute that rock and sand passing through a suction dredge is a pollutant; that the South Fork Clearwater River is a navigable water; and that a suction dredge is a point source. *Compare* ICL's Mem. ISO MSJ, pp. 13-16 (Dkt. 38-2), *with* Poe's Opp. to ICL's MSJ, p. 8 (Dkt. 43). In turn, this reveals a lynchpin issue of the case: whether Mr. Poe's suction dredge mining involves the "discharge" or "addition" of a pollutant to the South Fork Clearwater River. ICL says it does. Mr. Poe says it does not.

According to Mr. Poe, "suction dredge mining adds nothing to the dredged streambed material that is returned to the river or stream," essentially arguing that, because suction dredge mining does not add anything to the water *not already there to begin with*, there can be no addition of any pollutant and thus no discharge of a pollutant for the EPA to permit. Poe's Opp. to ICL's MSJ, p. 10 (Dkt. 43); *see also* Poe's Mem. ISO MSJ, pp. 9-12 (Dkt. 39-2). The CWA does not resolve the issue by clearly defining (or defining at all) what the term "addition" means in this setting. But the EPA has, interpreting it to include the "resuspension" of rocks and sands from a placer mining sluice box to a stream, even when those materials came from the bed of the stream itself – an interpretation the Ninth Circuit adopted in *Rybachek v. EPA*, 904 F.2d 1276 (9th Cir. 1990).

In *Rybachek*, miners challenged the EPA's CWA regulations that required treating sluice box discharge water from placer mining, arguing that placer mining does not cause the "addition" of a pollutant. The Ninth Circuit rejected that argument, explaining:

> In the sluicing process, a miner places the ore in an on-site washing plant (usually a sluice box) which has small submerged dams (riffles) attached to its bottom. He causes water to be run over the paydirt in the sluice box;

when the heavier materials (including gold) fall, they are caught by the riffles. The lighter sand, dirt, and clay particles are left suspended in the wastewater released from the sluice box.

Placer mining typically is conducted directly in streambeds or on adjacent property. The water usually enters the sluice box through gravity, but may sometimes also enter through the use of pumping equipment. At some point after the process described above, the water in the sluice box is discharged. The discharges from placer mining can have aesthetic and water-quality impacts on waters both in the immediate vicinity and downstream. Toxic metals, including arsenic, cadmium, lead, zinc, and copper, have been found at a higher concentration in streams where mining occurs than in non-mining streams.

. . . .

[W]e will not strike down the EPA's finding that placer mining discharges pollutants within the meaning of the [CWA]. Placer miners excavate the dirt and gravel in and around waterways, extract any gold, and discharge the dirt and other non-gold material into the water.

On the one hand, if the material discharged is not from the streambed itself, but from the bank alongside, this is clearly the discharge into navigable waters of a pollutant under the [CWA]. Congress defined "pollutant" as meaning, among other things, "dredged spoil . . ., rock, sand, [and] cellar dirt . . . ." 33 U.S.C. § 1362(6) (1982). The term "pollutant" thus encompasses the materials segregated from gold in placer mining. Congress defined "discharge" as any "addition [ ] to navigable waters from any point source." 33 U.S.C. § 1362(12) (1982). Because, under this scenario, the material discharged is coming not from the streambed itself, but from outside it, this clearly constitutes an "addition."

*And on the other hand, even if the material discharged originally comes from the streambed itself, such resuspension may be interpreted to be an addition of a pollutant under the [CWA]. See Avoyelles Sportsmen's League, Inc. v. Marsh*, 715 F.2d 897, 923 (5th Cir. 1983) (stating that "[t]he word 'addition,' as used in the definition of the term 'discharge,' may reasonably be understood to include 'redeposit'"); *United States v. M.C.C. of Florida, Inc.*, 772 F.2d 1501, 1506 (11th Cir. 1985) (action of digging up sediment and redepositing it on sea bottom by boat propellers constitutes an addition of pollutants). We will follow the lead of the Fifth and Eleventh Circuits and defer to the EPA's interpretation of the word "addition" in the [CWA].

*Id*. at 1282, 1285-86 (certain internal citations omitted, emphasis added); *see also Borden Ranch P'ship v. U.S. Army Corps of Eng'rs*, 261 F.3d 810, 814-15 (9th Cir. 2001) (upholding *Rybachek*

in context of "deep ripping" in protected wetlands, stating: "[A]ctivities that destroy the ecology of a wetland are not immune from the [CWA] merely because they do not involve the introduction of material brought in from somewhere else. . . . [B]y ripping up the bottom layer of soil, the water that was trapped can now drain out. While it is true, that in so doing, no new material has been 'added,' a 'pollutant' has certainly been 'added.'"); *E. Or. Mining Assoc. v. Dep't of Envtl. Quality*, 445 P.3d 251, 254-55 (Or. 2019) ("*EOMA*") (though acknowledging a federal Court of Appeals decision does not bind state court interpreting federal law, nonetheless "agree[ing] with *Rybachek* that the EPA reasonably has concluded that the suspension of solids and the remobilization of heavy metals resulting from suction dredge mining constitutes the 'addition' of a pollutant that requires a permit under the [CWA].").[5]

Because the court in *Rybachek* recognized that the statutory term "addition" is ambiguous, it deferred to the EPA's reasonable conclusion that the suspension of solids resulting from placer mining – a practice that includes suction dredge mining – constitutes the "addition" of a pollutant within the meaning of the CWA. *See Rybachek*, 904 F.2d at 1284-86 (citing *Chevron U.S.A., Inc. v. Nat. Res. Def. Council*, 467 U.S. 837, 844 (1984); *EPA v. Nat'l Crushed Stone Ass'n*, 449 U.S. 64, 83 (1980) (stating that "this Court shows great deference to the interpretation given the statute by the officers or agency charged with its administration")). The undersigned agrees – not only that the CWA (was and) remains ambiguous on this point, but also

_____

[5] Mr. Poe argues that "[o]nly the Supreme Court of Oregon has relied on *Rybachek* to conclude that the resuspension of and the remobilization of heavy materials from suction dredge mining constitute an 'addition' of a pollutant under the CWA requiring a Section 402 permit." Poe's Opp. to ICL's MSJ, p. 17 (Dkt. 43). Even if true, Poe fails to also note that no other court has specifically addressed whether suction dredge mining causes an "addition" of a pollutant. Moreover, he similarly says nothing about that fact that there are no cases that reject *Rybachek's* holding or its application to these (or similar) facts. Though *EOMA's* holding is not binding on this Court, the undersigned finds that its consideration of and decision upon the very same issues comprehensive and persuasive, such that this Memorandum Decision and Order largely tracks the analysis contained therein and is to be read consistently where appropriate.

that the EPA (did and) continues to reasonably interpret "addition" of a pollutant to include the

byproduct of suction dredge mining that likewise warrants agency deference.

For example, in 2018, responding to comments regarding the reissuance of the General

Permit for suction dredge mining in Idaho, the EPA's regional office reaffirmed that the

suspension of solid materials caused by suction dredge mining constitutes the "addition" of a

pollutant to the water. *See* Resp. to Comments Idaho Small Dredge General Permit (GP) at p. 5,

attached as Ex. Z to Second Hurlbutt Decl. (Dkt. 38-17) (citing and discussing *Rybachek*). In

response to a different comment, the EPA explained:

> If, during suction dredging, only water was picked up and placed back
> within the same water body, the commenter would be correct that no
> permit would be necessary. However, in suction dredging, bed material is
> also picked up with water. Picking up the bed material is in fact the very
> purpose of suction dredging – the bed material is processed to produce
> gold. This process is an intervening use that causes the addition of
> pollutants [rock and sand, see CWA § 502(6)] to be discharged to waters
> of the United States. As a result, . . . an NPDES permit is required for the
> discharge from this activity.

*Id*. at p. 6 (internal citation omitted); *see also infra* (noting same response's consideration and

rejection of *S. Fla. Water Mgmt. Dist. v. Miccosukee Tribe*, 541 U.S. 95 (2004)). Then, when

later reissuing the General Permit for suction dredge mining in Idaho, the EPA again decided

that suction dredge mining adds pollutants to the river, explaining further:

> Dredging systems are classified as hydraulic or mechanical (including
> bucket dredging), depending on the methods of digging. Suction dredges,
> the most common hydraulic dredging system, are popular with small scale
> and recreational gold placer miners. Suction dredges consist of a
> supporting hull with a mining control system, excavating and lifting
> mechanism, gold recovery circuit, and waste disposal system. All floating
> dredges are designed to work as a unit to extract, classify, beneficiate ores,
> and discharge. The disposal system is a discrete conveyance, or point
> source, from which pollutants are or may be discharged.
>
> Because suction dredges work the stream bed, the discharges from suction
> dredges consist of stream water and bed material. The primary pollutant
> of concern in the discharges from a suction dredge is suspended solids,

> defined as total suspended non-filterable solids. The suspended solids discharged from suction dredges result from the agitation of stream water and stream bed material in the dredge while processing the material. The discharged suspended solids result in a turbidity plume, or cloudiness, in the receiving water. *This discharge, when released into waters of the United States, constitutes the addition of a pollutant from a point source that is subject to NPDES permitting.*

2018 Fact Sheet at p. 8, attached as Ex. 7 to MTD (Dkt. 17-3) (emphasis added); *see also EOMA*, 445 P.3d at 254-55 (noting, and giving deference to additional (1) restrictions that reflect "EPA's considered conclusion that suction dredge mining can result in the addition of pollutants to navigable waters in the form of suspended solids and 'remobilized' heavy metals," and (2) Corps and EPA regulations "recogniz[ing] that redepositing materials dredged from stream and river beds constitutes a regulable discharge or addition of a pollutant").

Mr. Poe insists, however, that suction dredge mining cannot introduce or add any new pollutants into the water because "[t]hese materials already exist within the water body . . . ." Poe's Opp. to ICL's MSJ, p. 11 (Dkt. 43). He claims that "[t]his movement is similar to the Supreme Court cases holding that a movement of water and pollutants through dams, pump stations, and other drainages does not result in the 'addition' of a pollutant into waters of the United States." *Id.* (citing *Los Angeles Cnty. Flood Control Dist. v. Nat. Res. Def. Council, Inc.*, 568 U.S. 78, 80-82 (2013) ("*L.A. County*"); *Miccosukee Tribe*, 541 U.S. at 109-112 (2004)). But these cases do not speak to the situation at hand and thus do not operate to overturn *Rybachek*.

In *L.A. County*, the Supreme Court reaffirmed that "the transfer of polluted water between 'two parts of the same water body' does not constitute a discharge of pollutants under the CWA." *L.A. County*, 568 U.S. at 82. "No pollutants are 'added' to a water body," the Court said, "when water is merely transferred between different portions of that water body." *Id*. Similarly, in *Miccosukee Tribe*, polluted water was removed from a canal, transported through a pump station, and then deposited into a nearby reservoir. *See Miccosukee Tribe*, 541 U.S. at 100.

The Court held that, if the canal and reservoir were simply two parts of the same water body, then there is no "addition" of pollutants, analogizing to ladling soup from a pot and simply pouring the ladled soup back into the pot. *See id*. at 109-112 ("[I]f C-11 and WCA-3 are simply two parts of the same water body, pumping water from one into the other cannot constitute an 'addition' of pollutants. . . . 'If one takes a ladle of soup from a pot, lifts it above the pot, and pours it back into the pot, one has not 'added' soup or anything else to the pot.'") (internal citation omitted, quoting *Catskill Mountains Chapter of Trout Unlimited v. City of New York*, 273 F.3d, 481, 492 (2nd Cir. 2001)).

Mr. Poe's reliance on these cases misses the point. Suction dredge mining does not simply transfer water (what the above cases address); to the contrary, it excavates rock, gravel, sand, and sediment from the riverbed and then *adds* those materials back to the river – this time, in suspended form. *See EOMA*, 445 P.3d at 255 (distinguishing *L.A. County* and *Miccosukee Tribe*, pointing out: "[T]he EPA reasonably could find that suction dredge mining does more than merely transfer polluted water from one part of the same water body to another. Rather, the EPA reasonably could find that suction dredge mining adds suspended solids to the water and can 'remobilize' heavy metals that otherwise would have remained undisturbed and relatively inactive in the sediment of stream and river beds.") (internal quotation marks omitted). If Mr. Poe's suction dredge just sucked up river water from – and back into – the South Fork Clearwater River (along with any pollutants already in the water), he would be transferring water and not adding any pollutants under *L.A. County* and *Miccosukee Tribe*.[6] But that is neither

---

[6] The EPA stated as much when responding to a comment submitted as part of the reissuance of the General Permit for suction dredge mining in Idaho. *See* Resp. to Comments Idaho Small Dredge General Permit (GP) at p. 6, attached as Ex. Z to Second Hurlbutt Decl. (Dkt. 38-17) ("The soup ladle example referenced by the commenter refers to a water transfer, which means 'an activity that conveys or connects waters of the U.S. without subjecting the transferred water to intervening industrial, municipal, or commercial use' (40 C.F.R. § 122.3(i)).

suction dredge mining, nor what Mr. Poe did on the South Fork Clearwater River during the 2014, 2015, and 2018 dredging seasons.[7]

In sum, the very nature of Mr. Poe's suction dredge mining added pollutants to the South Fork Clearwater River. *Rybachek* therefore applies to require an NPDES permit under Section 402 of the CWA.[8]

---

Notably, '[t]his exclusion does not apply to pollutants introduced by the water transfer activity itself to the water being transferred.' *Id*. If, during suction dredging, only water was picked up and placed back within the same water body, the commenter would be correct that no permit would be necessary. *See South Florida Water Management Dist. v. Miccosukee Tribe of Indians*, 541 U.S. 95 (2004). However, in suction dredging, bed material is also picked up . . . ."); *see supra*.

[7] The EPA has also pursued CWA administrative enforcement actions against two other dredge miners on the South Fork Clearwater River for their unpermitted dredging in 2015. *See* ICL SOF No. 41 (Dkt. 38-1). In one action, the miner and the EPA entered into a Consent Agreement, with that miner agreeing to pay a civil penalty. *See id*. In the other, the EPA prevailed before an ALJ in proving CWA liability for discharging pollutants from a suction dredge without an NPDES permit, with the ALJ characterizing that miner's reliance on *L.A. County* and *Miccosukee Tribe* as "misplaced because:

> [T]he operation of Respondent's suction dredge involves the removal of otherwise latent materials from the bed of the South Fork Clearwater River, the separation of the materials by weight as they travel through the dredge, and the reintroduction of the leftover lighter materials to the waterway in a physically altered form, namely, suspended solids, thereby transforming those materials into "pollutants" and altering the base of the river where the materials are both removed and redeposited. This process can hardly be likened to the simple transfer of water.

*Id*. (citing 9/27/18 Order on Complainant's Motion for Accelerated Decision, pp. 18-19, attached as Ex. BB to Second Hurlbutt Decl. (Dkt. 38-19)).

[8] Mr. Poe questions the scope of *Rybachek's* holding, claiming that (1) it did not speak to the issue of whether recreational suction dredge mining results in the discharge of dredged or fill material, and that (2) its position on whether suction dredge mining absolutely adds pollutants to a water body was more equivocal than not. *See* Poe's Opp. to ICL's MSJ, pp. 14-18 (Dkt. 43). However, *Rybachek* is not being cited here to claim that suction dredge mining does not involve dredge or fill material; rather, *Rybachek* supports the conclusion that suction dredge mining adds pollutants to a waterbody, alongside agency deference. *See infra* (discussing dredge or fill material vis à vis suction dredge mining). Second, any traction gained by pointing out that *Rybachek* only held that a resuspension of materials "*may* be interpreted to be an addition of a

**B.  The Processed Material Discharged From Mr. Poe's Suction Dredge Mining on the South Fork Clearwater River Is a Pollutant, not Dredged or Fill Material, and Requires an NPDES Permit Under Section 402 of the CWA**

Mr. Poe alternatively argues that, even if his suction dredge mining adds pollutants to the South Fork Clearwater River, the waste discharged from his operation constitutes dredged or fill material over which the Corps has exclusive permitting authority.  *See* Poe's Mem. ISO MSJ, pp. 4-9 (Dkt. 39-2) (citing *Coeur Alaska, Inc. v. S.E. Alaska Conservation Council*, 557 U.S. 261, 273-74 (2009) (if single discharge constitutes "dredged or fill material" and another "pollutant," only Corps has authority under CWA to issue permit authorizing discharge of that material into navigable water)).[9]  He contends that the Corps' regulations implementing the CWA (in particular, its definitions for "discharge of dredged material" and "dredge material") equivocally establish that suction dredge mining falls under the Corp's Section 404 authority as a discharge of either dredged or fill material – full stop.  *See* Poe's Mem. ISO MSJ, pp. 8-9 (Dkt. 39-2) ("Under any reading of the regulations, suction dredge mining involves the discharge of dredged or fill material regulated by the Corps under Section 404.  The regulations provide an answer

---

pollutant under the [CWA]," recedes when, at the very least, the comparisons to be drawn from *Rybachek's* analysis to the instant action are nonetheless obvious and compelling, and that, other than *EOMA*, no other court has confronted whether suction dredge mining adds pollutants to the water body.  And, on that score, *EOMA* unquestionably applied *Rybachek* to hold that it does.  *See supra*.

[9]  The initial issue in *Coeur Alaska* was whether the EPA or the Corps had authority under the CWA to issue a permit for the discharge of mining slurry into a lake.  *See Coeur Alaska*, 557 U.S. at 273.  The parties agreed that the slurry constituted *both* "fill" (which was subject to the Corps' permitting authority) *and* a "pollutant" (which was subject to the EPA's permitting authority).  *See id.* at 275.  The Court concluded that, in those circumstances, the CWA gave the Corps sole authority to issue a permit for the discharge of the slurry into the lake.  *See id.* at 273-74.  Therefore, to be clear, *Coeur Alaska* only decided who – between the Corps or the EPA – had permitting authority in instances where a discharge simultaneously involved fill and a pollutant; it did not address whether suction dredge mining actually discharged either fill or a pollutant (because, again, the parties agreed that both existed).  Here, however, the parties disagree over whether the material discharged from Mr. Poe's suction dredge mining constitutes dredged material or a pollutant/processed waste.  *See, e.g.*, *EOMA*, 445 P.3d at 256-57.

and, therefore, 'there is no plausible reason for [agency] deference' in this case.") (quoting *Kisor v. Wilke*, 139 S.Ct. 2400, 2415 (2019)).  The undersigned is not so convinced.

To begin, the CWA does not define the phrases "dredged material" or the "discharge of dredged material."  *See EOMA*, 445 P.3d at 257 ("More specifically, it does not define whether material that was dredged from navigable water remains 'dredged material' after it has been processed.  And, if processing dredged material can change its character, the text does not identify the point at which the processed material becomes a pollutant other than dredged material that is subject to the EPA's rather than the Corps' permitting authority.").  "[I]f Congress has not spoken directly to that issue, then the Corps and the EPA's reasonable interpretation of the [CWA] both in issuing regulations and interpreting their regulations is entitled to deference in determining whether a discharge constitutes 'fill,' 'dredged material,' or some other 'pollutant.'"  *Id*. (citing *Coeur Alaska*, 557 U.S. at 277-78 (explaining that, if text of CWA is ambiguous, courts look to agencies' implementing regulations and, if those regulations are ambiguous, to agencies' interpretation and application of their regulations to determine what CWA means)).  Except, as *EOMA* highlights (after setting out the regulatory history in "mind-numbing" detail), the regulations implementing the CWA – while persuasive and dispositive to Mr. Poe (*see supra*)) – do not specifically address which agency has authority to permit the discharge of material resulting from suction dredge mining and, to that end, are not free of ambiguity themselves.  Tracking *EOMA*, the issue's landscape in that respect unfolds as follows:

- In 1975, the Corps adopted definitions of "dredged material" and the "discharge of dredged material."

  The regulations defined (1) "dredged material" as "material that is excavated or dredged from navigable waters," and (2) "discharge of dredged material" as:

  > any addition of dredged material, in excess of one cubic yard when used in a single or incidental operation, into navigable

waters. The term includes, without limitation, the addition of dredged material to a specified disposal site located in navigable waters and the runoff or overflow from a contained land or water disposal area. Discharges of pollutants into navigable waters resulting from the onshore subsequent processing of dredged material that is extracted for any commercial use (other than fill) are not included within this term and are subject to Section 402 of the [CWA].

33 C.F.R. §§ 209.120(d)(4),(5) (1976). These definitions have remained largely unchanged. *Compare id.*, *with* 33 C.F.R. §§ 323.2(c),(d); *see also* Poe's Mem. ISO MSJ, p. 5 (Dkt. 39-2).

Importantly, the definition of "discharge of dredged material" identified an exception to that definition, providing that "[d]ischarges of pollutants into navigable waters resulting from the onshore subsequent processing of dredged material extracted for any commercial use (other than fill) are not included within the term and are subject to Section 402 of the [CWA]." 33 C.F.R. § 209.120(d)(5) (1976); *compare id.*, *with* 33 C.F.R. § 323.2(d)(2)(i); *see also* Poe's Mem. ISO MSJ, p. 6 (Dkt. 39-2). In explaining the exception, the Corps stated that "[d]ischarges of materials from land based commercial washing operations are regulated under Section 402 of the [CWA]" by the EPA. 40 Fed. Reg. 31320, 31321 (July 25, 1975); Poe's Mem. ISO MSJ, p. 6 (Dkt. 39-2).[10]

---

[10] In *EOMA*, the court found that "[t]he exception makes clear that *the act of processing* dredged material can result in the discharge of a 'pollutant' that requires a permit from the EPA under Section 402 rather than the discharge of 'dredged material' that requires a permit from the Corps under Section 404." *EOMA*, 445 P.3d at 259 (emphasis added); *see also id*. at n.8. Even so, the petitioners there (like Mr. Poe here) relied on the exception to argue that it distinguished between discharges resulting from processing dredged material on land (subject to the EPA's permitting authority), and discharges resulting from processing dredged material over water (subject to the Corps' permitting authority). *See id*.; *compare with* Poe's Mem. ISO MSJ, p. 7 (Dkt. 39-2) ("Suction dredge mining also does not involve 'onshore processing' under 33 C.F.R. § 323.2(d)(2)(i), because mining and any discharge occur entirely in-stream. The exclusion for Section 404 regulation does not apply since the discharged dredge material is also not processed nor commercially washed on the land, it simply passes through the dredge and over a sluice box back into the same river."). The court in *EOMA* disagreed with the distinction, noting that (1) the exception applies to discharges from onshore processing of dredged material that is extracted for a commercial use, but that if dredged material is extracted for some other use (a recreational one, for example), then the exception does not apply regardless of whether the dredged material is processed over land or water; and (2) the reference to a single exception to the definition of "discharge of dredged material" does not *ipso facto* mean that the Corps intended that all other discharges resulted from land-based and water-based processing of dredged material would be subject to the Corps', rather than the EPA's, permitting authority. *EOMA*, 445 P.3d at 259-60 ("Because the 1975 regulatory definition of 'discharge of dredged material' either does not address or does not unambiguously resolve whether discharges resulting from suction dredge

- In 1977, the Corps considered when the discharge of "waste materials such as sludge, garbage, trash, and debris in water" would constitute "fill" that was subject to the Corps' permitting authority and when they would constitute another pollutant that was subject to the EPA's permitting authority. *See* 42 Fed. Reg. 37122-30 (July 19, 1977).

  Initially, the Corps took the position that the answer to that question turned on the purpose for which those materials were discharged into the water. *See id*. It modified the definition of "fill" in the 1977 regulations to "exclude those pollutants that are discharged into water primarily to dispose of waste," with the result being that the EPA would have permitting authority over waste discharged primarily for that purpose, while the Corps would have permitting authority over waste that was discharged primarily to convert wetlands into dry land. *See id*.; *compare with* 33 C.F.R. §§ 323.2(e)(1)(i-ii),(2),(f) ("Examples of such fill material include, but are not limited to: rock, sand, soil, clay, plastics, construction debris, wood ships, overburden from mining or other excavation activities, and materials used to create any structure or infrastructure in the waters of the United States.").

- In 1986, the EPA and the Corps entered into a Memorandum of Agreement "to resolve a difference (since 1980) between Army and EPA over the appropriate CWA program for regulating certain discharges of solid wastes into waters of the United States." 51 Fed. Reg. 8871 (March 14, 1986). Among other things, the Agreement established criteria to determine when waste would be considered "fill" subject to the Corps' authority, and when it would be considered another pollutant subject to the EPA's authority. *See id*. at 8872 ("Whereas the definitions of the term "fill material" contained in the aforementioned regulations have created uncertainty as to whether Section 402 of the [CWA] or Section 404 is intended to regulate discharges of solid waste materials into waters of the United States for the purpose of disposal of waste . . . .").

  The Agreement identified four criteria for determining when waste discharged into water ordinarily would be regarded as fill subject to the Corps' authority. *See id*. (at ¶¶ B(4)(a-d)). Relevant here, the Agreement then described when waste discharged into the water would be considered a pollutant subject to the EPA's authority:

    [A] pollutant (other than dredged material) will normally be considered by EPA and the Corps to be subject to Section 402 if it is a discharge in liquid, semi-liquid, or suspended form or if it is a discharge of solid material of a homogenous nature normally associated with single industry wastes, and

---

mining are subject to the Corps' or the EPA's permitting authority, we look to the ways in which the Corps and the EPA subsequently resolved that issue.").

from a fixed conveyance, or if trucked, from a single site and set of known processes. These materials include *placer mining wastes*, phosphate mining wastes, titanium mining wastes, sand and gravel wastes, fly ash, and drilling muds. As appropriate, EPA and the Corps will identify additional such materials.

*Id*. at ¶ B(5) (emphasis added).[11]

- Also in 1986, the Corps issued a regulation defining the term "discharge of dredged material," as used in Section 404, to mean "any addition of dredged material into the waters of the United States," but expressly excluding "*de minimis*, incidental soil movement occurring during normal dredging operations." 51 Fed. Reg. 41,206, 41,232 (November. 13, 1986).

- In 1990, the Corps issued a regulatory guidance letter that interpreted the 1986 Memorandum of Agreement and stated that the material discharged as a result of placer mining is subject to the EPA's exclusive permitting authority:

   Paragraph B.5 in the Army's 23 Jan 86 Memorandum of Agreement (MDA) with EPA, concerning the regulation of solid waste discharges under the [CWA], states that discharges that result from in-stream mining activities are subject to regulation under Section 402 and not under Section 404.

   Dredged material is that material which is excavated from the waters of the United States. *However, if this material is subsequently processed to remove desired elements, its nature has been changed; it is no longer dredged material.* The raw materials associated with placer mining operations are not being excavated simply to change their location as in a normal dredging operation, *but rather to obtain materials for processing, and the residue of this processing should be considered waste.* Therefore, placer mining waste is no longer dredged material *once it has been processed, and its*

---

[11] In *EOMA*, the Court found the first sentence of paragraph B(5) to be broad enough to include *unprocessed* dredged material within EPA's permitting authority (explaining why it was explicitly excepted), whereas its second sentence identifies specific examples of *processed* waste that will be subject to the EPA's authority. *See EOMA*, 445 P.3d at 261-62 ("Not only does the second sentence expressly name the specific types of processed waste over which the EPA will have permitting authority, but it lists 'placer mining wastes,' which includes waste from suction dredge mining, as one of the wastes that will fall within the EPA's authority. Put differently, the second sentence makes clear that placer mining wastes are pollutants other than dredged material and thus subject to the EPA's permitting authority.").

> *discharge cannot be considered to be a "discharge of*
> *dredged material" subject to regulation under Section 404.*

Corps' Regulatory Guidance Letter 88-10, SUBJECT: Regulation of Waste Disposal from In-Stream Placer Mining, attached as Ex. A to Third Hurlbutt Decl. (Dkt. 44-2) (emphasis added).

- In 1993, the Corps excluded "*de minimus*, incidental soil movement occurring during normal dredging operations" from the definition of "discharge of dredged material" and expanded the regulatory definition to include "'[a]ny addition, including any redeposit of dredged material, including excavated material, into waters of the United States.'" *Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1402 (D.C. Cir. 1998) (quoting 33 C.F.R. § 323.2(d)(1)(iii) (1993)). Responding to challenges that this expanded definition now included "incidental fallback" that occurred during dredging, the Court of Appeals for the District of Columbia Circuit held that "incidental fallback" did not require a permit under the CWA. *See Nat'l Mining Ass'n*, 145 F.3d at 1404 ("[T]he straightforward statutory term 'addition' cannot reasonably be said to encompass the situation in which material is removed from the waters of the United States and a small portion of it happens to fall back."). The Court of Appeals therefore directed the Corps to exclude "incidental fallback" from the definition of "discharge of dredged materials." *See id*. at 1406 (reconciling direction to exclude "incidental fallback" from definition of "discharge of dredged materials" with *Rybachek*, reasoning: "[*Rybachek* addressed] "the discrete act of dumping leftover material into the stream after it had been processed," not "imperfect extraction, i.e., extraction accompanied by incidental fallback of dirt and gravel.").

- In 1999, the Corps initially declined to define "incidental fallback" and explained that it would identify it on a case-by-case basis. *See* Fed. Reg. 25120, 25121 (May 10, 1999) ("[W]e have promulgated today's rule to comply with the injunction issued in [*Nat'l Mining Ass'n*], and as described below, will expeditiously undertake notice and comment rulemaking that will make a reasoned attempt to more clearly delineate the scope of CWA jurisdiction over redeposits of dredged material in waters of the U.S. In the interim, we will determine on a case-by-case basis whether a particular redeposit of dredged material in waters of the United States requires a Section 404 permit, consistent with our CWA authorities and governing case law.").

- In 2000, the Corps issued a proposed rule in the form of a rebuttable presumption that identified the types of mechanized earth-moving activities that ordinarily would result in the discharge of dredged material. *See* 65 Fed. Reg. 50108, 50111-12 (August. 16, 2000) ("Today's proposed rule would modify our definition of "discharge of dredged material" by establishing a rebuttable presumption that regulable discharges result from

certain types of activities in waters of the U.S. In particular, the proposal would apply the rebuttable presumption to mechanized land clearing, ditching, channelization, in-stream mining, or other mechanized excavation activity in waters of the U.S., including wetlands."). The effect of the proposed rule was to shift the burden of persuasion to the regulated party to prove that any discharge was only incidental fallback. *See id* at 50113 ("Persons proposing to conduct activities subject to today's proposal may rebut the presumption that a regulable discharge of dredged material would occur by showing that the activity is planned and conducted so as to result only in incidental fallback. . . . Today's proposal would state our expectation that, absent a demonstration to the contrary, the activities addressed in the proposed rule typically will result in more than incidental fallback and thus result in regulable redeposits of dredged material.").[12]

- In 2001, the Corps issued a final rule that retained the substance of the presumption, but stated that the burden of proof would not shift. *See* 33 C.F.R. § 323.2(d)(2)(i). The 2001 rule sought to define the phrase "incidental fallback" in two ways: (1) by identifying the types of activities that ordinarily will result in something more than incidental fallback; and (2) by specifically defining the phrase:

> (i) The Corps and the EPA regard the use of mechanized earth-moving equipment to conduct land clearing, ditching, channelization, in-stream mining or other earth-moving activity in waters of the United States as resulting in a discharge of dredged material unless project-specific evidence shows that the activity results in only incidental fallback. This paragraph (i) does not and is not intended to shift any burden in any administrative or judicial proceeding.

---

[12] In the preamble to the 2000 proposed rule, the Corps again recognized the apparent distinction between processes and unprocessed dredged material when citing to *Rybachek*. *See* 65 Fed. Reg. at 50110 (explaining *Rybachek* as: "removal of dirt and gravel from a streambed and its subsequent redeposit in the waterway after segregation of minerals in an 'addition of a pollutant' under the CWA subject to EPA's Section 402 authority"). That description is consistent with *Nat'l Mining Ass'n's* earlier-referenced explanation that *Rybachek* had addressed "the discrete act of dumping leftover material into the stream after it had been processed," not "imperfect extraction, i.e., extraction accompanied by incidental fallback of dirt and gravel." *See supra* (citing *Nat'l Mining Ass'n*, 145 F.3d at 1406). The court in *EOMA* suggests that the explanation for the 2000 proposed rule goes even further than *Nat'l Mining Ass'n*, and (together with the 2001 final rule (*see infra*)) is "consistent with the Corps' and the EPA's earlier conclusion that the discharge of placer mining waste is not the discharge of dredged material and that, as a result, the EPA is authorized to issue permits under Section 402 of the [CWA] for the processed waste discharged as a result of suction dredge mining" (and decidedly "[not] an intent to depart from the conclusion in the 1986 Memorandum of Agreement"). *EOMA*, 445 P.3d at 265.

(ii) *Incidental fallback* is the redeposit of small volumes of dredged material that is incidental to excavation activity in waters of the United States when such material falls back to substantially the same place as the initial removal. Examples of incidental fallback include soil that is disturbed when dirt is shoveled and the back-spill that comes off the bucket when such small volume of soil or dirt falls into substantially the same place from which it was initially removed.

*Id*. at §§ 323.2(d)(2)(i-ii) (2001).[13]

Against this scrim, the undersigned finds that the CWA's text and the agencies' implementing regulations leave open another critical question: whether *other* instances of processing dredged material (beyond the one instance identified in the regulations for onshore processing (*see supra*)) will result in the discharge of a pollutant subject to Section 402 or the discharge of dredged material subject to Section 404. *See, e.g.*, *EOMA*, 445 P.3d at 270 ("[T]he regulations do not resolve whether the discharges resulting from suction dredge mining

---

[13] Like Mr. Poe here, the petitioners in *EOMA* argued that the reference to "in-stream mining" in paragraph (i) includes suction dredge mining which establishes that suction dredge mining ordinarily results in the discharge of dredged material subject to the Corps' authority. *Compare EOMA*, 445 P.3d at 264, *with* Poe's Mem. ISO MSJ, p. 8 (Dkt. 39-2) (citing and quoting 66 Fed. Reg. 4550, 4560-4561 (January 17, 2001)). But the court in *EOMA* highlighted how the petitioners "focus[ed] on only half the sentence," since the rule applies only to "the use of mechanized earth-moving equipment to conduct . . . in-stream mining." *EOMA*, 445 P.3d at 264 ("The small shop-vac-like equipment used to conduct suction dredge mining hardly qualifies as 'mechanized earth-moving equipment,' unless one views vacuum cleaners and other small suction devices as 'mechanized earth-moving equipment.' Were there any doubt about the matter, the explanation for the 2001 rule removes it. It explains that the phrase 'mechanized earth-moving equipment' refers to 'bulldozers, graders, backhoes, bucket dredges, and the like.'") (quoting 66 Fed. Reg. 4552 (January 17, 2001)). Additionally, the court declared that "[t]he 2001 rule was not intended to determine, nor did it determine, whether discharges resulting from processing dredged material were subject to the Corps or the EPA's permitting authority," and "[w]hen both the entire rule and the reason for promulgating it are considered, we cannot agree with petitioners that the 2001 rule signaled a departure from the Corps and the EPA's stated position in the 1986 Memorandum of Agreement." *Id*. Regardless, in 2008, the Corps repealed the 2001 rule listing the type of earth-moving activities that ordinarily would result in the discharge of dredged material and simply excepted "incidental fallback" from the definition of discharge of dredge material. *See id*. at 263 (citing 33 C.F.R. § 323.2(d)(2)(iii) (2008)); *see also id*. at n.16 (Not relying too heavily on fact of repeal when "[n]either the 1986 Memorandum of Agreement or the Corps' 1990 guidelines letter . . . are currently in force.").

constitute a pollutant subject to Section 402 or dredged material subject to Section 404. *Both the statutes and the regulations are genuinely ambiguous on that question*.") (emphasis added); *see also id*. at 271 (same). This uncertainty necessitates an examination of the history, both of the EPA and the Corps, of issuing permits for suction dredge mining. *See id*. at 266 ("It is precisely because the regulations leave that question open that the EPA and the Corps' *application of the statute and regulations* matters.") (emphasis added).

Addressing the same issue, *EOMA* examined the historical issuance of EPA general permits (and the Corps' corresponding acknowledgment) for suction dredge mining in Alaska and Idaho. *See id*. at 266-68. In each instance, the court found a shared understanding between the two agencies that acknowledged the EPA's permitting authority as to suction dredge mining. *See id*. at 267 (for Alaska: "As the Corps' and the EPA's joint exercise of authority in Alaska demonstrates, those agencies have adhered to the distinction reflected in the 1986 Memorandum of Agreement and stated in the Corps' 1990 regulatory guidance letter. The EPA has issued permits for discharges resulting from small scale suction dredge mining, and the Corps has recognized the EPA's authority to do so."); *see also id*. at 268 (for Idaho: "The EPA thus reaffirmed that the material discharged as a result of suction dredge mining is a pollutant that requires a permit from the EPA under Section 402 and not dredged material that requires a permit from the Corps under Section 404.") (citing and quoting Resp. to Comments Idaho Small Dredge General Permit (GP) at p. 7, attached as Ex. Z to Second Hurlbutt Decl. (Dkt. 38-17) (discussing (1) commenters' confusion between "discharge of dredged material" and "discharge of pollutant," while reaffirming its position that material discharged as result of suction dredge mining is "discharge of pollutant" subject to regulation under Section 402 and not incidental fallback, and (2) how Corps "routinely informs applicants who request a [Section] 404 permit for small suction dredging in Idaho that, unless a regulable discharge of dredged or fill material will

occur, the EPA is the lead agency for the activity.")). After rejecting other possibly-consistent

applications between the agencies on the issue (one of which Mr. Poe also cites here (*see* Poe

Mem. ISO MSJ, pp. 17-18 (Dkt. 39-2))), *EOMA* ultimately concluded:

> In our view, the regulatory history reveals that, from 1986 to 2018, the
> EPA and the Corps *have been on the same page*. From the 1986
> Memorandum of Agreement between the EPA and the Corps to the
> general permits issued by the EPA in 2018 and the Corps in 2017, both
> agencies consistently have recognized that processed waste discharged as
> a result of suction dredge mining is a pollutant that requires a permit from
> the EPA under Section 402. Similarly, they consistently have concluded
> that the discharge resulting from suction dredge mining is not "dredged
> material" that requires a permit from the Corps under Section 404.

*EOMA*, 445 P.3d at 269 (emphasis added); *see also id*. at 273 (same).

ICL urges the Court to follow *EOMA*'s lead here. *See generally* ICL's Opp. to Poe's

MSJ, pp. 6-16 (Dkt. 44). ICL references how, in 2004, the Idaho Department of Environmental

Quality, Nez Perce Tribe, and EPA prepared the South Fork Clearwater Subbasin Assessment

and Total Maximum Daily Loads ("2004 TMDL") to address sediment and temperature

pollution, and stated therein that suction dredge mining requires a Section 402 permit. *See id*. at

p. 10 (citing 2004 TMDL at p. 100, attached as Ex. W to Second Hurlbutt Decl. (38-14)

("Suction dredges are considered to be point sources, and therefore are required to obtain an

NPDES permit to discharge . . . .")).

The Court acknowledges that even with such additional context, as with the regulations

themselves (*see supra*), there is space to argue otherwise – specifically, that the EPA and the

Corps have not consistently applied Sections 402 and 404 to suction dredge mining activity over

the years – an argument that Mr. Poe puts forward. *See* Poe's Mem. ISO MSJ, pp. 16-18 (Dkt.

39-2); *but see* ICL's Opp. to Poe's MSJ, pp. 9-13 (Dkt. 44).[14] But whatever patchwork of

---

[14] Moreover, responding to Mr. Poe's claim that the EPA previously endorsed the Idaho
Department of Water Resources' ("IDWR") permit program as sufficient, ICL points out that

permitting authority has existed over time, from *at least 2013* (via the general permitting process, initiated in 2010 and after notice and comment), it is *the EPA* that has required a Section 402 permit for suction dredge mining. This fact, coupled with the overall approach to and assignment and acceptance of responsibilities under the EPA's and the Corps' interpretation of the applicable regulations to suction dredge mining (*see supra*), confirms that the agencies have taken an official position and made a fair and considered judgment, based on its substantive expertise, that the operation of a suction dredge results in the discharge of processed wastes, thus requiring Section 402 permits. *See, e.g.*, *EOMA*, 445 P.3d at 272 ("The concern is not with the navigability of the water body, a concern that falls within the Corps' expertise; rather, the concern is with the health of the water body, a concern that lies at the heart of the EPA's expertise. The Corps and the EPA reasonably could conclude that the EPA was better suited than the Corps to make those types of water quality decisions. The risks posed by the cumulative effects of multiple suction dredge mining operations on the overall health of a stream differ from the sort of engineering issues that the Corps typically addresses."). The Court therefore defers to the interpretation by these agencies that the processed material discharged from Mr. Poe's

---

such an argument not only overlooks the undisputed *current state* of the EPA's and the Corps' permitting authority (in Idaho and elsewhere), it also fails to reconcile the distinctions between the IDWR and Section 402 permitting programs. *See* ICL's Opp. to Poe's MSJ, pp. 10-11 (Dkt. 44) ("IDWR's permitting program was not and is not an authorized CWA program; IDWR's program implements Idaho's state law for protecting streambeds and streambanks from alterations. . . . EPA's view on the environmental adequacy of a non-CWA state program like IDWR's simply has no bearing on whether CWA permits are required."); *see also* ICL's Reply ISO MSJ, pp. 9-10 (Dkt. 46) (same); Resp. to Comments Idaho Small Dredge General Permit (GP) at p. 6, attached as Ex. Z to Second Hurlbutt Decl. (Dkt. 38-17) (discussing distinction between IDWR and EPA permits in response to commenter question: "The EPA permit and the [IDWR] permit are issued under two different authorities for two different reasons. The EPA NPDES permit is issued pursuant to the [CWA] and is an authorization to discharge wastewater to waters of the United States. IDWR regulates the alteration of stream channels from the use of recreational mining equipment in a stream under the Idaho Stream Channel Protection Act.").

suction dredge mining on the South Fork Clearwater river is a pollutant, not dredged or fill material, and requires an NPDES permit under Section 402 of the CWA.

## IV. <u>ORDER</u>

Based on the foregoing, IT IS HEREBY ORDERED that (1) Plaintiff Idaho Conservation League's Motion for Summary Judgment on Liability (Dkt. 38) is GRANTED; and (2) Defendant Shannon Poe's Motion for Summary Judgment (Dkt. 39) is DENIED.

Within two weeks of the date of filing of this Memorandum Decision and Order, the parties are to file a joint status report, speaking to any subsequent stages left to be decided in the case and proposed briefing schedules, for such remaining issues, if any.

DATED: June 4, 2021

Ronald E. Bush
Chief U.S. Magistrate Judge