## UNITED STATES DISTRICT COURT
## DISTRICT OF IDAHO

| | |
|---|---|
| IDAHO CONSERVATION LEAGUE, | Case No.: 1:18-cv-353-REP |
| Plaintiff, | **MEMORANDUM DECISION AND** |
| vs. | **ORDER RE: PLAINTIFF IDAHO** |
| | **CONSERVATION LEAGUE'S** |
| | **MOTION FOR REMEDIES** |
| SHANNON POE, | |
| Defendant. | **(Dkt. 59)** |

Pending before the Court is Plaintiff Idaho Conservation League's Motion for Remedies (Dkt. 59).  Having carefully reviewed the record and the parties' briefs, the Court finds that the facts and legal arguments are adequately presented.  Accordingly, in the interest of avoiding further delay, and because the Court finds that the decisional process would not be significantly aided by oral argument, the Court will decide the Motion without oral argument.  Dist. Idaho Loc. Civ. R. 7.1(d)(1)(B).[1]  For the reasons that follow, the Motion is granted insofar as the Court will issue injunctive relief and assess civil penalties against Defendant Shannon Poe in the amount of $150,000.

## I.  RELEVANT BACKGROUND

The circumstances giving rise to this citizen-suit enforcement action are largely undisputed:[2] Mr. Poe suction dredge mined 42 days on the SFCR during the 2014, 2015, and

---

[1]  Through correspondence with the Court, the parties confirmed that their briefing did not request oral argument and neither party was otherwise requesting one.

[2]  In denying Defendant Shannon Poe's Motion to Dismiss on September 30, 2019, the Court generally discussed the characteristics of the South Fork Clearwater River ("SFCR"); recreational suction dredge mining and National Pollutant Discharge Elimination System ("NPDES") permit requirements under the Clean Water Act ("CWA"); Idaho's permitting requirements for suction dredge mining; Mr. Poe's suction dredge mining activities on the SFCR without an NPDES permit in 2014, 2015, and 2018; and Plaintiff Idaho Conservation League's

**MEMORANDUM DECISION AND ORDER  - 1**

2018 dredge seasons (running from July 15 to August 15 each year) without ever obtaining an NPDES permit under Section 402 of the CWA.

Through this action, ICL argued that Mr. Poe violated the CWA each of the 42 times he operated a suction dredge on the SFCR without an NPDES permit.  Mr. Poe countered that (i) his suction dredge mining did not actually add pollutants to the SFCR and therefore did not require an NPDES permit (or any other CWA permit) in the first place; and even if his suction dredge mining *did* add pollutants, (ii) those pollutants are "dredged" or "fill" material regulated exclusively under Section 404 (not Section 402) of the CWA and therefore did not require an NPDES permit, and (iii) any discharges of dredged or fill material from his suction dredge mining are only "incidental fallback," making them exempt under Section 404 of the CWA anyway.  The parties agreed to bifurcate the case into two separate phases: a liability phase decided on the parties' cross-motions for summary judgment, followed by a remedial phase as necessary.

On June 4, 2021, the Court granted summary judgment in ICL's favor.  *Idaho Conservation League v. Poe*, 2021 WL 2316158 (D. Idaho 2021).  At that time, U.S. Magistrate Judge Ronald E. Bush concluded that (i) Mr. Poe's suction dredge mining added pollutants to the SFCR, thus requiring an NPDES permit under Section 402 of the CWA; and (ii) the processed material discharged from Mr. Poe's at-issue suction dredge mining is a pollutant, not dredged or fill material, and required an NPDES permit under Section 402 of the CWA.  *Id*. at *2-12.[3]

---

("ICL") correspondence to Mr. Poe in 2016, 2017, and 2018, advising him of its intention to initiate a CWA citizen suit against him if he continued to suction dredge mine in Idaho without an NPDES permit.  *Idaho Conservation League v. Poe*, 421 F. Supp. 3d 983, 986-90 (D. Idaho 2019).  This backdrop, while important for perspective, will not be repeated in depth here.

[3]  The undersigned inherited this case from Judge Bush on June 11, 2021.  Before then, Judge Bush presided over the action and issued rulings on multiple aspects of the case, including the liability phase.

**MEMORANDUM DECISION AND ORDER  - 2**

With the liability phase now complete, the action shifts to the remedial phase, framed by ICL's pending Motion for Remedies.  ICL requests that, owing to Mr. Poe's CWA violations, the Court order (i) an injunction barring Mr. Poe from suction dredge mining in Idaho unless he obtains and complies with an NPDES permit under the CWA, and (ii) civil penalties against Mr. Poe of at least $564,924.  Mem. ISO Mot. for Remedies at 3, 7-22 (Dkt. 59-1).  Mr. Poe responds that an injunction is unnecessary and moot because there are no longer any illegal discharges to enjoin and that, regardless, a $60,924 civil penalty is more in line with the environmental impacts of such dredge mining and will sufficiently deter him from ever suction dredge mining on the SFCR without an NPDES permit again.  Resp. to Mot. for Remedies at 5, 9-24 (Dkt. 63). These arguments are taken up below.

## II.  DISCUSSION

### A.    Legal Standards

The CWA authorizes courts "to order that relief it considers necessary to secure prompt compliance with the Act," including an "order of immediate cessation."  *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 320 (1982); *see also* 33 U.S.C. §§ 1319(b),(d) & 1365(a).  Discretion is vested in the court to either grant or deny a request for injunctive relief depending upon its view of the range of public interests at issue.  *Weinberger*, 456 U.S. at 320.  If a court chooses to grant an injunction, however, it must meet the requirements of Federal Rule of Civil Procedure 65(d), which requires that every injunction (i) state the reasons why it was issued, (ii) state its terms specifically, and (iii) describe in reasonable detail – without reference to the complaint or other document – the act or acts restrained or required.  Fed. R. Civ. P. 65(d); *see also Reno Air Racing Ass'n. Inc. v. McCord*, 452 F.3d 1126, 1132 (9th Cir. 2006).

The CWA additionally permits courts "to apply any appropriate civil penalties."  33 U.S.C. § 1365(a).  Civil penalties are mandated for CWA violations.  33 U.S.C. § 1319(d) (any

person who violates the CWA "*shall* be subject to a civil penalty not to exceed $25,000 per day

for each violation.") (emphasis added); *see also Natural Res. Def. Council. v. Sw. Marine, Inc.*,

236 F.3d 985, 1001 (9th Cir. 2000) (holding that penalties are mandatory if violation of CWA is

found).  The maximum daily penalty has increased periodically to account for inflation.

Relevant here, for violations that occurred between December 6, 2013 and November 2, 2015,

the maximum penalty is $37,500 per violation; for violations that occurred after November 2,

2015 (where penalties are assessed after January 12, 2022), the maximum penalty is $59,973.  40

C.F.R. § 19.4 at Tables 1 & 2.  Unlike damages in other civil cases, these penalties do not inure

to the citizen plaintiffs, but are payable to the United States Treasury.  *See Friends of the Earth*

*v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 173 (2000).

As between injunctive relief and civil penalties, "the district court has discretion to

determine which form of relief is best suited, in the particular case, to abate current violations

and deter future ones."  *Id*. at 192.

**B.**     **Injunctive Relief Is Appropriate to Ensure Compliance With the CWA**

ICL requests a permanent injunction barring Mr. Poe from suction dredge mining in

Idaho unless he obtains and complies with an NPDES permit under Section 402 of the CWA.

Mem. ISO Mot. for Remedies at 7 (Dkt. 59-1).

The standard for a permanent injunction is essentially the same as for a preliminary

injunction with the exception that the plaintiff need not show a likelihood of success on the

merits because actual success has already been achieved.  *Amoco Prod. Co. v. Gambell*, 480 U.S.

531, 546 n.12 (1987).  Therefore, to demonstrate that a permanent injunction should issue, the

plaintiff must establish the following: "(i) that it has suffered an irreparable injury; (ii) that

remedies available at law, such as monetary damages, are inadequate to compensate for that

injury; (iii) that, considering the balance of hardships between the plaintiff and defendant, a

**MEMORANDUM DECISION AND ORDER  - 4**

remedy in equity is warranted; and (iv) that the public interest would not be disserved by a permanent injunction." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 156-57 (2010).

This traditional balancing of harms applies in the environmental context. *The Lands Council v. McNair*, 537 F.3d 981, 1005 (9th Cir. 2008) ("Our law does not . . . allow us to abandon a balance of harms analysis just because a potential environmental injury is at issue."). However, injunctive relief "is not mechanically obligated . . . for every violation of law." *Weinberger*, 456 U.S. at 313. Courts have broad latitude when determining the scope of an injunction and must balance the equities between the parties and give due regard to the public interest. *Geertson Seed Farms v. Johanns*, 570 F.3d 1130, 1136 (9th Cir. 2009). If proper, any injunctive relief should be framed "no broader than required by the precise facts." *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 222 (1974); *see also Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1140 (9th Cir. 2009) ("'Injunctive relief . . . must be tailored to remedy the specific harm alleged.' 'An overbroad injunction is an abuse of discretion.'") (quoting *Lamb-Weston v. McCain Foods, Ltd.*, 941 F.2d 970, 974 (9th Cir. 1991)).

ICL argues that the elements comprising a permanent injunction are met and thereby justify the requested injunctive relief. Mem. ISO Mot. for Remedies at 3, 8-12 (Dkt. 59-1). Mr. Poe disagrees – not because any of the elemental prerequisites for a permanent injunction do not exist per se, but because a permanent injunction is unnecessary and moot since he is no longer suction dredge mining in Idaho and civil penalties are available to deter future CWA violations. Resp. to Mot. for Remedies at 13-16 (Dkt. 63). Though sensible on their face, Mr. Poe's arguments are ultimately unpersuasive here. An injunction is warranted.

     1.   <u>An Injunction Prevents Irreparable Injury</u>

"Environmental injury, by its nature . . . is often permanent or at least of long duration, *i.e., irreparable*. If such injury is sufficiently likely, therefore, the balance of harms will usually

favor the issuance of an injunction to protect the environment." *Amoco Prod.*, 480 U.S. at 545

(emphasis added).  During the earlier liability phase, the Court concluded as a matter of law that

Mr. Poe's suction dredge mining added pollutants to the SFCR, stating in relevant part:

> A Section 402/NPDES permit is required if a person (i) discharged, i.e., added (ii) a pollutant (iii) to navigable waters (iv) from (v) a point source. There is no dispute that rock and sand passing through a suction dredge is a pollutant; that the [SFCR] is a navigable water; and that a suction dredge is a point source.  In turn, this reveals a lynchpin issue of the case: whether Mr. Poe's suction dredge mining involves the "discharge" or "addition" of a pollutant to the [SFCR].  ICL says it does.  Mr. Poe says it does not.
>
> . . . .
>
> Suction dredge mining does not simply transfer water . . . ; to the contrary, it excavates rock, gravel, sand, and sediment from the riverbed and then *adds* those materials back to the river – this time, in suspended form.  If Mr. Poe's suction dredge just sucked up river water from – and back into – the [SFCR] (along with any pollutants already in the water), he would be transferring water and not adding any pollutants . . . .  but that is neither suction dredge mining nor what Mr. Poe did on the [SFCR] during the 2014, 2015, and 2018 dredging seasons.
>
> In sum, the very nature of Mr. Poe's suction dredge mining added pollutants to the [SFCR] [and] require[s] an NPDES permit under Section 402 of the CWA.

*Poe*, 2021 WL 2316158, at *3, 6-7 (emphasis in original, internal quotation marks and citations

omitted).  But ICL cannot obtain injunctive relief merely because the Court has made a finding

of liability under the CWA; it still must connect the legal dots between Mr. Poe's suction dredge

mining and corresponding irreparable injury.

ICL does this by juxtaposing the SFCR's pristine ecosystem with suction dredge mining

activity generally.  It points out how, on the one hand, the SFCR is a "State Protected River"; is

eligible as a federal wild and scenic river; and is a vital fishery, inhabited by many native fish

species, including those listed as "threatened" under the Endangered Species Act ("ESA")

(steelhead trout, fall Chinook salmon, and bull trout).  Mem. ISO Mot. for Remedies at 5-6, 9

**MEMORANDUM DECISION AND ORDER - 6**

(Dkt. 59-1) (citing Ex. 7 to Poe MTD at 45 (Dkt. 17-3);[4] Ex. 8 to Poe MTD at 3-83 (Dkt. 17-4);

Ex. V to 2nd Hurlbutt Decl. at 1 (Dkt. 38-13)).  Yet, on the other hand, it emphasizes how the

SFCR is still listed as an "impaired" water body because it fails to meet CWA standards for

sediment and temperature pollution; how the rock, sand, sediment, and silt discharged from

suction dredge mining degrades water quality and impedes river habitat restoration; and how the

sediment and fine silt discharged by a suction dredge reduces oxygen levels, aquatic cover,

forage, and invertebrate production, which impact the survival of fish eggs and alevins, the

growth in older and juvenile fish, and ultimately fish migrations and spawning seasons.  Mem.

ISO Mot. for Remedies at 6,9 (Dkt. 59-1) (citing ICL SOF at ¶¶ 3, 10 (Dkt. 38-1); Ex. U to 2nd

Hurlbutt Decl. at 1-2 (Dkt. 38-12)).

     More specific to Mr. Poe's suction dredge mining on the SFCR, ICL highlights the

opinions of its expert, Dan Kenney.[5]  Mr. Kenney discusses basic stream morphology and

biology, suction dredge mining in relation to the SFCR stream morphology in particular, and Mr.

Poe's site-specific suction dredge mining in 2014, 2015, and 2018, before summarizing the

physical and biological effects of those same dredging activities on the SFCR.  Kenney Rpt.

attached as Ex. G to 4th Hurlbutt Decl. at 3-24 (Dkt. 59-9).  On that last point, Mr. Kenney notes

the following:

---

[4]  Though listed as a "State Protected River," the SFCR has exemptions for recreational suction dredge mining.  Ex. 7 to Poe MTD at 45 (Dkt. 17-3).  Even so, this acknowledgment exists within the "Fact Sheet" to an EPA proposal to reissue an NPDES General Permit to small suction dredgers operating in Idaho.  *Id*. at 1.

[5]  Mr. Kenney is a former Forest Service fisheries biologist with extensive experience monitoring and assessing suction dredge mining and its impacts in the Clearwater River watershed, including the SFCR.  Kenney Rpt., attached as Ex. G to 4th Hurlbutt Decl. at 1-3 (Dkt. 59-9).  In addition to scientific papers and state and federal agency studies and reports on suction dredge mining and its impacts, Mr. Kenney's opinions are based on photos, videos, and reports of Mr. Poe's suction dredge mining on the SFCR in 2014, 2015, and 2018.  Mr. Poe challenges aspects of Mr. Kenney's opinions but not his qualifications.

- There is ample evidence that Mr. Poe's 2014, 2015, and 2018 activities on the SFCR affected algae, invertebrates, and fish. As described above, a total of up to about 3,400 square feet of surface substrate, predominately algae-covered rocks (gravel and larger), was removed from the SFCR during the 3 dredging seasons and some were either overturned or dropped into the dredge holes, while a separate but at least equal-sized area of the SFCR surface substrate was covered with tailings piles or fine sediment by Mr. Poe's activities.

- Given that the SFCR is already considered "impaired" due to too much fine sediment, some of the dredged and otherwise modified areas likely had too-thick of a layer of fine sediment pre-dredging to allow algae to grow, and so the total amount of attached algae harmed by Mr. Poe may be somewhat less than 3,400 square feet. Attached algae is a food source for many aquatic invertebrates, so, at least locally and temporarily, the primary production of the SFCR was reduced.

- The same surface substrate modified by 2014, 2015, and 2018 dredging by Mr. Poe was habitat for aquatic invertebrates, as was at least a portion of the hyporheic zone, and so the manipulation of the substrate in the dredging process caused an unknown number of individuals to be loosed into the water column, and another unknown number of individuals to be covered by or have their interstitial habitat infiltrated by sand and smaller fines. . . . [I]t seems likely that hundreds of thousands of aquatic insects were displaced, harmed, or killed by Mr. Poe's dredging activities.

- The fine sediment brought to the substrate surface or suspended in the water column by Mr. Poe's dredges would have been mostly scoured away from the substrate surface in direct vicinity of the dredging sites within a few months – these fines did not disappear from the river, however, but did contribute incrementally to degraded aquatic habitat locally for miles downstream on the SFCR and eventually to the mainstem Clearwater River.

- I cannot say with certainty that Mr. Poe's activities would have directly injured or killed any individuals of special status species, however, stream margins are often important habitat for juvenile steelhead and other salmonids and my October 7, 2015 notes for the upper unauthorized dredging site state that the "(b)ank undercut by dredger for length of hole." The downstream Poe dredge hole at the 2018 #1 site was at the stream edge, as were Sites #2 and #3 that year. The Poe primary dredging area in 2014 was in mid-channel, however, and I don't know where Mr. Poe dredged at the downstream (Moose Creek) site.

- I think it likely that direct and indirect adverse effects to aquatic insect growth, survival, and abundance (even if incremental, localized, or temporary) were caused by Mr. Poe's suction dredging in each year he dredged on the SFCR. In regard to 2018 SFCR suction dredging, a report commissioned by IDWR [(Idaho Department of Water Resources)] concluded that "(a)ll disturbed areas will experience a reduction in invertebrate production from fine sediment, leading to a reduction in foraging opportunities for anadromous and resident fish species."

**MEMORANDUM DECISION AND ORDER - 8**

- While some small fish are apparently not repelled by suction dredging operations, it is possible that some SFCR fish were physically or behaviorally excluded from rearing, holding, and migratory habitat by the Poe operations. . . . . [W]hile noise, activity, and turbidity definitely can modify adult fish behavior, the degree to which the Poe operations did so is unknown, but likely minor compared with effects on habitat.

- When Mr. Poe and his assistants suctioned substrate at depth, they were also bringing gravel and finer rock particles to the surface to cover the existing substrate surface in the SFCR channel. These particles, as noted above regarding aquatic invertebrates, infiltrated interstitial spaces in some portions of the dredging reach. Juvenile and sub-adult salmonids, including bull trout, often seek out interstitial habitat (especially that among cobbles and boulders) during diel feeding periods (or winter in general). The rearrangement and addition of fine sediment to the stream channel during Mr. Poe's suction dredging activities is likely to have reduced the local quantity or quality of such habitat, even considering that some of these fines would have been scoured from the dredging sites by subsequent high flow events and deposited downstream. The effects of the addition of previously-unmobilized fine sediment from the Poe dredging likely incrementally reduced interstitial hiding cover for fish in the SFCR channel for miles downstream.

- Based on my experience in delineating NPCNF [(Nez Perce-Clearwater National Forest)]-approved dredging reaches, the areas that Mr. Poe dredged and covered with tailings and fines in each relevant year do not appear to be spawning habitat for any special status fish species, and so there was a low likelihood that his activities directly affected salmonid redds, eggs, or pre-emergent fry. On the other hand, there are areas with suitable spawning habitat for steelhead (and to a lesser extent, spring and fall Chinook salmon) within a few hundred feet downstream of at least the Sasquatch 2 sites for each year, and I think that is reasonable to assume that this habitat was incrementally degraded by the excavation of previously immobile fine sediment.

- Excavation and dispersion of previously-sequestered fines by dredging operations can contribute to the pollution in the SFCR that the EPA is attempting to control through the TMDL [(Total Maximum Daily Load)] and the NPDES permitting process which Mr. Poe has defied and encouraged others to defy.

- The effects of suction dredging on water quality, stream channel conditions, and stream biota are real and some of these effects similar to the effects of natural phenomena such as flooding and erosion.

- Even if the adverse effects of Mr. Poe's dredging were entirely erased each year by high streamflows (and many are not), these effect would still be manifest for days, weeks, or months. These periods constitute a substantial part of a lifetime to many or most aquatic organisms. Similarly, and particularly in 2015 and 2018, even if the adverse effects of each of Mr. Poe's dredging operations are considered as insignificant in isolation (and many are not), Mr. Poe set up his operations nearby

**MEMORANDUM DECISION AND ORDER - 9**

other dredgers in a relatively short river reach, such that the cumulative effects of these activities were most likely to be exacerbated.

- The goal of a suction dredge miner is to find gold through the dismantling of a portion of the physical structure of a stream. Because most placer gold will find its way to or near the bedrock surface, typically at least several feet below the substrate surface, this dismantling is essentially an overturning and redistribution of the existing structure of the stream at the dredging site. Because flowing water, both concurrently with and subsequent to dredging, transmits these physical effects downstream, the effects of the dredging are not confined to the immediate dredge mining area.

- Mr. Poe's dredging operations on the SFCR in 2014, 2015, and 2018 had demonstrable immediate and enduring effects on SFCR water quality and stream channel morphology. Based on my training, experience, and my review of the scientific literature, I believe that these physical effects were harmful to individual aquatic organisms in the SFCR. The degree and duration of Mr. Poe's dredging operations' harm to populations of these organisms or the SFCR biological community cannot be known with certainty but I believe that incremental and cumulate adverse effects should be considered plausible and likely.

*Id*. at 24-29, 30-31 (internal citations omitted).

Mr. Poe takes issue with certain of Mr. Kenney's opinions, offering up an expert of his own: Andréa Rabe.[6] Ms. Rabe contends that, while suction dredge mining may impact water quality, stream channel conditions, and stream biota due to the movement and release of fine sediments, *small-scale suction dredge mining* (like Mr. Poe's) does not (or at least can be conducted in a manner to reduce and eliminate such impacts). Rabe Rpt., attached as Ex. 1 to Resp. to Mot. for Remedies at 3, 11-12 (Dkt. 63-2). She more directly opines that Mr. Poe's

---

[6] Ms. Rabe has a bachelors in genetics and anthropology, a masters in botany, and is a certified professional wetlands scientist. Rabe Rpt., attached as Ex. 1 to Resp. to Mot. for Remedies at 15 (Dkt. 63-2). Ms. Rabe has over 23 years' experience conducting water quality monitoring, stream surveys, habitat assessments, and wetlands delineations; preparing water quality monitoring plans; and preparing and implementing restoration plans. *Id*. Ms. Rabe reviewed Mr. Kenney's report and the documents he relied on, as well as additional photos and videos of Mr. Poe's dredging operations, state and federal permit requirements, and the Forest Service and Bureau of Land Management's Decision Record for Small-Scale Dredging in Orogrande and French Creeks and South Fork Clearwater River.

MEMORANDUM DECISION AND ORDER - 10

suction dredge mining on the dates in question mostly[7] followed permitting authorities' operating procedures and how Mr. Kenney's claims do not unequivocally establish injury to the SFCR.  *Id.* at 3-11, 15.  Importantly, she does not ultimately disagree that there are likely impacts from Mr. Poe's dredging operations, just that any such impacts are not occurring to the extent expressed by Mr. Kenney given Mr. Poe's adherence to these operating procedures – even without having ever obtained an NPDES permit.  *Id.* at 12, 15 ("This reduction and elimination of impacts will occur whether the operating procedures are implemented as permit conditions *or as best management practices by a suction dredge operator. . . .*  Mr. Poe *employed most of these best management practices* in his operations during the dredging seasons in 2014, 2015, and 2018, thereby reducing the impacts from his small-scale suction dredging operation on water quality, stream channel conditions, and stream biota.") (emphasis added).[8]

From this, it is clear that suction dredge mining (even small-scale, recreational suction dredge mining) disturbs a riverbed's substrate and discharges sediment into the water column, causing aesthetic and environmental harm.  This is especially the case in a sensitive environment like the SFCR – a critical habitat for ESA-listed species and an already-impaired river due to the failure to meet state water quality standards for sediment and temperature.  Fortunately, steps can be taken to mitigate these harms, including a permitting process that outlines a specific suction dredge mining season and strict operational protocols.

---

[7]  Suction dredge operations should not discharge within 800 feet of another suction dredge operation discharge that is occurring at the same time.  Rabe Rpt., attached as Ex. 1 to Resp. to Mot. for Remedies at 5 (Dkt. 63-2).  Ms. Rabe acknowledges that Mr. Poe was not always at least 800 feet from the next dredge operation, but he did add spacing to maintain lower levels of turbidity.  *Id.*

[8]  To be clear, Mr. Poe does not offer Ms. Rabe's opinions to contest ICL's argument that his suction dredge mining on the SFCR caused irreparable injury.  Rather, these opinions support his argument that any harm was de minimis and that any civil penalties should reflect that reality.  *See infra*.

**MEMORANDUM DECISION AND ORDER - 11**

Here, however, Mr. Poe never secured an NPDES permit before suction dredge mining 42 days on the SFCR.  These repeated failures constitute CWA violations because his dredging activities added pollutants to the waterway and caused environmental harm.  Environmental harm in this sense amounts to irreparable injury.  *Amoco*, 480 U.S. at 545 (environmental injury, "by its nature," is irreparable).  That Mr. Poe may have obtained other permits with overlapping protections does not upend this conclusion.  Otherwise, there would be no purpose to the CWA's application in this setting.  The CWA regime exists alongside state permitting requirements and applies across all users as a whole, not just Mr. Poe.  A contrary position is not supported in the law and the Court will not stake that ground now.  This is particularly the case given CWA's straightforward objective: "to restore and maintain the integrity of the chemical, physical, and biological integrity of the Nation's waters."  33 U.S.C. § 1251(a); *see also Decker v. Nw. Envtl. Def. Ctr.*, 568 U.S. 597, 602 (2013) ("A central provision of the [CWA] is its requirement that individuals, corporations, and governments secure [NPDES] permits before discharging pollution from any point source into the navigable waters of the United States.").

With irreparable injury established, case law hints that the remaining factors favor injunctive relief to protect the environment.  *Amoco*, 480 U.S. at 545 ("If such [irreparable] injury is sufficiently likely, therefore, the balance of harms *will usually favor the issuance of an injunction* to protect the environment.") (emphasis added); *but see Earth Island Inst. v. Carlton*, 626 F.3d 462, 474 (9th Cir. 2010) (declining "to adopt a rule that *any* potential environmental injury *automatically* merits an injunction.") (emphasis in original, internal quotation marks and citation omitted).  The Court briefly addresses these factors below for completeness' sake.

2.    Legal Remedies Are Inadequate

The Supreme Court has recognized that, in most instances, environmental harms are not readily compensable by money damages.  *Amoco*, 480 U.S. at 545 ("Environmental injury, by its

nature, *can seldom be adequately remedied by money damages* and is often permanent or at least

of long duration, i.e. irreparable.") (emphasis added).  Moreover, money damages are not even

available to ICL.  The only relief available in a CWA citizen-suit enforcement action is the

enforcement of standards, limitations, and orders, or the application of civil penalties paid to the

United States Treasury.  33 U.S.C. § 1365(a).  As a result, legal remedies are plainly inadequate.

      3.       <u>The Balance of Hardships Favors an Injunction</u>

Even where environmental injury is established, courts must still engage in the traditional

balancing of harms test before entering an injunction.  This includes a consideration of all of the

competing interests at stake including potential economic harm.  *Carlton*, 626 F.3d at 475.  Here,

there is no counterweight to the irreparable injury caused by Mr. Poe's permitless suction dredge

mining on the SFCR.  That is, any burden in complying with the CWA by securing the legally-

necessary NPDES permit – what the requested injunctive relief requires – is not a hardship, let

alone one that would eclipse the above-stated environmental harms.  *See Idaho Conservation

League v. Atlanta Gold Corp.*, 879 F. Supp. 2d 1148, 1161 (D. Idaho 2012) ("Harm to

environment outweighs a defendant's financial interests, particularly where violations are of a

longstanding and continual nature.").

      4.       <u>An Injunction Is in the Public Interest</u>

Courts have recognized that ensuring protection of the environment serves an important

public interest.  *McNair*, 537 F.3d at 1005 ("[P]reserving environmental resources is certainly in

the public's interest."); *Earth Island Inst.*, 442 F.3d at 1177 ("The preservation of our

environment . . . is clearly in the public interest.").  Recognizing the public interest in protecting

the environment, it is likewise very much in the public interest to expect compliance with the

CWA.  *See U.S. v. Akers*, 785 F.2d 814, 823 (9th Cir. 1986) ("[C]ourts have noted that the public

interest requires strict enforcement of the [CWA] to effectuate its purpose of protecting sensitive

**MEMORANDUM DECISION AND ORDER  - 13**

aquatic environments."); *Atlanta Gold Corp.*, 879 F. Supp. 2d at 1162 ("Water is the West's most precious resource.  Keeping Idaho's waters sufficiently clear of toxic elements so that they can support all the beneficial uses for which the State has designated them is a critical public interest . . . .").  Mr. Poe does not argue otherwise.

     5.    <u>Other Factors Do Not Undermine the Need for an Injunction</u>

Beyond the customary factors that inform the propriety of an injunction, Mr. Poe's arguments against one take a more practical, big-picture approach.  He claims that an injunction is simply (i) unnecessary to secure his compliance with the CWA because he is not currently suction dredge mining in Idaho (and has not done so since 2018) and (ii) moot given the availability of civil penalties.  Resp. to Mot. for Remedies at 13-16 (Dkt. 63).  These arguments are without merit.

First, it is misleading to suggest that Mr. Poe complied with the CWA once ICL brought this action.  *See id.* at 14 (Mr. Poe stating: "[I]f a defendant comes into compliance with the CWA after a complaint is filed, then the principles of mootness prevent maintenance of a suit for injunctive relief . . . .").  It may be true that he has not technically violated the CWA since then, but that is only because he has not suction dredge mined in Idaho and therefore never needed to pull an NPDES permit.  This is *not* because he has proactively secured an NPDES permit before again suction dredge mining in the state.  The distinction is important when understanding that the mere cessation of a challenged practice in response to pending litigation "does not moot a case *unless the party alleging mootness can show that the 'allegedly wrongful behavior could not reasonably be expected to recur.*'"  *Nat. Res. Def. Council v. Cnty. of Los Angeles*, 840 F.3d 1098, 1104 (9th Cir. 2016) (quoting *Laidlaw*, 528 U.S. at 189) (emphasis added); *see also Idaho Rural Council v. Bosma*, 143 F. Supp. 2d 1169, 1177 (D. Idaho 2001) (recognizing "a presumption of future injury" when a defendant has voluntarily ceased illegal activity in

**MEMORANDUM DECISION AND ORDER  - 14**

response to litigation, even if the cessation occurs before a complaint is filed."). Without the exception, "'courts would be compelled to leave [t]he defendant . . . free to return to his old ways.'" *Porter v. Bowen*, 496 F.3d 1009, 1017 (9th Cir. 2007) (quoting *U.S. v. Concentrated Phosphate Exp. Ass'n*, 393 U.S. 199, 203 (1968)).

The standard for determining whether a case has been mooted by a defendant's voluntary conduct is "stringent." *Laidlaw*, 528 U.S. at 189; *Concentrated Phosphate*, 393 U.S. at 203 ("A case might become moot if subsequent events *made it absolutely clear* that the allegedly wrongful behavior could not reasonably be expected to recur.") (emphasis added). "The 'heavy burden of persua[ding]' the court that the challenged conduct cannot reasonably be expected to start up again lies with the party asserting mootness." *Laidlaw*, 528 U.S. at 189 (quoting *Concentrated Phosphate*, 393 U.S. at 203). This burden "protects plaintiffs from defendants who seek to evade sanction by predictable protestations of repentance and reform." *Gwaltney of Smithfield v. Chesapeake Bay Found.*, 484 U.S. 49, 67 (1987).

The Court previously touched on this issue in relation to Mr. Poe's efforts to dismiss the action at its outset. At that time, Mr. Poe argued that the Court did not have subject matter jurisdiction because ICL failed to meet the CWA's notice requirements. Specifically, Mr. Poe argued that ICL's 2016 notice letter advising him that it intended to initiate a citizen-suit enforcement action relied on wholly past violations, not prospective ones. *Poe*, 421 F. Supp. 3d at 991. The Court disagreed, stating:

> Mr. Poe properly acknowledges that [ICL] must have a good faith allegation of continuing or intermittent violations for a court to have jurisdiction over a suit. . . . Here, ICL made good faith allegations of continuing/intermittent CWA violations based not only on Mr. Poe's history of suction dredging on the [SFCR], but also his public statements about his past dredging, about his ongoing dredging, and about his plans for dredging in future years (including statements about defying the EPA and the CWA). Indeed, it could reasonably be said that Mr. Poe was intentionally advertising to the world not just the fact of his prior suction dredging activities but also the fact of his intended

> future suction dredging activities.  That Mr. Poe ultimately resumed suction
> dredging activities on the [SFCR] in 2018 without any NPDES permit
> substantiates ICL's concerns about Mr. Poe's "continuing" and "ongoing"
> violations back in 2016.

*Id*. at 993 (citing *Sierra Club v. Union Oil Co. of Cal.*, 853 F.2d 667, 671 (9th Cir. 1988)

(agreeing that risk of ongoing violations must be "completely eradicated" for citizen suit to be

precluded, holding: "Intermittent or sporadic violations do not cease to be ongoing until the date

when there is no real likelihood of repetition.")).

A similar rationale applies now.  Yes, Mr. Poe properly stresses how he has not suction

dredge mined in Idaho since 2018.  And while that fact may suggest he does not intend to pick

back up where he left off, it does not satisfy his burden to establish compliance with the CWA in

the future.  To be sure, in the past, Mr. Poe has simply indicated that he "do[es] not intend to

dredge in future years *without the appropriate permits*."  Ex. C to Oppenheimer Decl. (Dkt. 20-

19) (emphasis added).  It is unclear what this commitment means or ever meant.  Critically, Mr.

Poe suction dredge mined on the SFCR in 2018 without an NPDES permit precisely because he

does not believe an NPDES permit is required to do so.  *Cf.* Resp. to Mot. for Remedies at 15

(Dkt. 63) (Mr. Poe acknowledging that "he never stated that he would not mine without first

obtaining an NPDES permit.").  Alas, that is what this entire case has been about.

At bottom, Mr. Poe must show that there is "no reasonable expectation that the wrong

will be repeated" and that it is "absolutely clear that the allegedly wrongful behavior would not

reasonably be expected to recur."  *Gwaltney*, 484 U.S. at 66.  Despite no known CWA violations

since 2018, Mr. Poe has not met that high burden here.  *See Atlanta Gold*, 879 F. Supp. 2d at

1162 (fact that violations were "of a continual, and long-standing nature" and that defendant

"passed up opportunities to fix the problem, strongly suggests that the added impetus of an

injunction is necessary.").  An injunction is neither unnecessary nor moot.

**MEMORANDUM DECISION AND ORDER  - 16**

Second, civil penalties – even considerable ones – do not preclude injunctive relief. These remedies are not mutually exclusive.  In fact, the CWA authorizes courts to impose one, the other, *or even both*.  *Supra*; *see also Idaho Conservation League v. Magar*, 2015 WL 632367, at *9 (D. Idaho 2015) ("[T]he Court finds both a substantial civil penalty and an injunction are necessary to remedy Magar's violations of the CWA."); *Atlanta Gold*, 879 F. Supp. 2d at 1171 ("To summarize, the longstanding and serious nature of the violations in this case require injunctive relief.  A substantial civil penalty is also necessary in order to have a deterrent effect on future pollution . . . ."); *Bosma*, 143 F. Supp. 2d at 1177 ("[A]n injunction against the Bosmas and their dairy operation will redress, at least in part, the injury of which the IRC complains.  Additionally, the civil penalties sought by IRC will likely deter the Bosmas and other NPDES permit violators from polluting the affected waters in the future.").  Simply put, whether civil penalties are imposed here (or the amount of such penalties) is immaterial; the factors discussed herein independently support injunctive relief.

      6.      <u>The Injunction is Limited to the SFCR</u>

As an extraordinary remedy, an injunction's scope must be narrowly and specifically tailored to fit the dispute that gives rise to its issuance, and not more.  *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1140 (9th Cir. 2009) ("'Injunctive relief . . . must be tailored to remedy the specific harm alleged.'  'An overbroad injunction is an abuse of discretion.'") (quoting *Lamb-Weston v. McCain Foods, Ltd.*, 941 F.2d 970, 974 (9th Cir. 1991)).

ICL seeks to enjoin Mr. Poe from suction dredge mining throughout Idaho unless he obtains and complies with an NPDES permit under the CWA.  Mem. ISO Mot. for Remedies at 3, 5, (Dkt. 59-1).  But this action is tied only to Mr. Poe's suction dredge mining on the SFCR.  There is no evidence in the record concerning what Mr. Poe did (or did not do) elsewhere in the

state and ICL makes no claims relating to any such conduct.  So, a state-wide injunction is not justified.

Mr. Poe counters that no injunction is warranted at all.  He complains that one would amount to a disfavored "obey the law" injunction and is "excessively intrusive" because it would require the Court's continual supervision.  Resp. to Mot. for Remedies at 13-14 (Dkt. 63).  Not so.  The injunction is not vague but rather sufficiently specific.  It requires Mr. Poe to secure and comply with an NPDES permit before suction dredge mining on the SFCR in the future.  These simple and straightforward terms are enough.  Further, no judicial oversight is warranted here. Once this action is closed, ICL can move to re-open the case and pursue contempt proceedings as necessary.  *See, e.g.*, *Idaho Conservation League v. Atlanta Gold Corp.*, 2017 WL 4099815 at *1 (D. Idaho 2017) ("This decision resolves a Motion for Civil Contempt . . . .  This is a re-opened Clean Water Act case, first filed in 2011.").

Consequently, an injunction will be issued barring Mr. Poe from suction dredge mining on the SFCR unless he obtains and complies in good faith with an NPDES permit under the CWA.

## C.    Civil Penalties in the Amount of $150,000 Are Warranted

ICL asks the Court to impose a civil penalty of at least $564,924 for Mr. Poe's 42 CWA violations.  Mem. ISO Mot. for Remedies at 14-22 (Dkt. 59-1).  Mr. Poe argues the Court should reject ICL's request as excessive and unduly burdensome, proposing that a $60,924 penalty more accurately addresses his conduct and the surrounding circumstances.  Resp. to Mot. for Remedies at 16-24 (Dkt. 63).

Congress has vested courts with the authority to determine an appropriate civil penalty for CWA violations.  *Tull v. U.S.*, 481 U.S. 412, 427 (1987).  Like other penalties, the purpose of a penalty under the CWA is to provide restitution, punish the violator, and deter similar conduct

**MEMORANDUM DECISION AND ORDER  - 18**

by the violator and others. *Id*. at 422. "A penalty must be high enough so that the discharger cannot 'write it off' as an acceptable environmental trade-off for doing business." *Hawaii's Thousand Friends v. City and Cnty. of Honolulu*, 821 F. Supp. 1368, 1394 (D. Haw. 1993).

Civil penalties in CWA cases involve "highly discretionary calculations that take into account multiple factors." *Tull*, 481 U.S. at 427. The factors courts must consider are: (i) the seriousness of the violations; (ii) the economic benefit, if any, resulting from the violations; (iii) any history of such violations; (iv) any good faith efforts to comply with the applicable requirements; (v) the economic impact of the penalty on the violator; and (vi) any other matters as justice may require. 33 U.S.C. § 1319(d).

When considering these statutorily-enumerated factors, courts generally employ either a "top-down" or "bottom-up" approach. *Atlanta Gold*, 879 F. Supp. 2d at 1165 (*comparing Sierra Club v. Cedar Point Oil Co.*, 73 F.3d 546, 573-74 (5th Cir. 1996) (employing top-down approach), *with U.S. v. Smithfield Foods, Inc.*, 191 F.3d 516, 528-29 (4th Cir. 1999) (taking bottom-up approach)). The top-down approach requires the court to first calculate the maximum penalty, and then, if necessary, to adjust the penalty downward in consideration of the six statutory factors. *Cedar Point*, 73 F.3d at 573. The bottom-up method begins with calculating the economic benefit realized by the defendant as a result of his non-compliance, and then adjusts that amount upward or downward based on the court's evaluation of the remaining factors. *Smithfield Foods*, 191 F.3d at 528.

ICL does not insist on either a top-down or bottom-up approach to calculating the proper civil penalties here. It references a $1,957,041 maximum penalty.[9] It settles on a proposed penalty of at least $564,924. ICL's figure is guided in large part by the $6,600 penalty imposed

---

[9] This represents a total of 25 violations in 2014 and 2015 at $37,500 per violation ($937,500) and 17 violations in 2018 at $59,973 per violation ($1,019,541).

**MEMORANDUM DECISION AND ORDER  - 19**

in a similar EPA civil enforcement action (*Erlanson* (discussed *infra*)) relating to a single day of unpermitted suction dredge mining on the SFCR in 2015.  Here, citing Mr. Poe's flagrant violations and need for deterrence, the ICL doubled the per-violation penalty to $13,200 and added Mr. Poe's $10,524 economic gain to the total penalty.  Mem. ISO Mot. for Remedies at 13-16 (Dkt. 59-1).  Mr. Poe favors a bottom-up approach because, according to him, it better reflects the minimal environmental harm caused by his suction dredge mining.  Resp. to Mot. for Remedies at 17 (Dkt. 63).

The Court will employ the bottom-up approach as the most practical to these facts.  This case is unique in that Mr. Poe did not outright ignore the need for an NPDES permit in the typical sense.  His decision not to secure an NPDES permit was informed, at least in part, by advice from his attorney, coupled with their correspondence with the EPA about whether he even needed an NPDES permit in the first instance.  *See infra*.  Also, it is not exactly clear how Mr. Poe's suction dredge mining violated NPDES permit standards (aside from not securing an NPDES permit in and of itself).  *Id*.  These considerations favor a bottom-up approach rather than beginning with a nearly $2 million maximum civil penalty and working down.  *See Atlanta Gold*, 879 F. Supp. 2d at 1166 (describing bottom-up approach as "more practical in this scenario, as arsenic and iron differ greatly in terms of the degree of the environmental harm they cause.").  With that, the Court turns to the above-referenced statutory factors for calculating CWA-related penalties.

1.   The Economic Benefit From Mr. Poe's CWA Violations

Mr. Poe's most obvious economic benefit in suction dredge mining on the SFCR without an NPDES permit is the value of mineral resources (gold) extracted therefrom.  Remedial phase discovery revealed that Mr. Poe mined up to six ounces of gold across 2014, 2015, and 2018.  Mem. ISO Mot. for Remedies at 18 (Dkt. 59-1).  At an estimated value of $1,754 per ounce, the

**MEMORANDUM DECISION AND ORDER  - 20**

value of Mr. Poe's unpermitted haul amounts to at least $10,524.  *Id*.  Mr. Poe does not disagree;

he folds this exact amount into his own civil penalty proposal.  Resp. to Mot. for Remedies at 17,

24 (Dkt. 63).  The civil penalty therefore begins at $10,524 and is subject to adjustment in light

of the remaining factors.

      2.    <u>The Seriousness and History of Mr. Poe's CWA Violations</u>

Congress flatly prohibited "the discharge of any pollutant by any person" except as in

compliance with the CWA.  33 U.S.C. § 1311(a).  There is no dispute that Mr. Poe violated this

prohibition time and again when he suction dredge mined on the SFCR without an NPDES

permit in 2014, 2015, and 2018.  These violations are unquestionably serious.  They not only

violated the law, but also caused environmental harm by lowering water quality.  *See supra*.

But in assessing the "seriousness" of these violations, it is important to keep in mind that

suction dredge mining *is* allowed on the SFCR.  In other words, this is not a case of Mr. Poe

suction dredge mining at a time and place where it was not lawfully permitted.  His problem is

that he *repeatedly* suction dredge mined without an NPDES permit (even if he did have a state

IDWR permit with some – though not completely – overlapping best management practices).

*See, e.g.*, *Poe*, 421 F. Supp. 3d at 998, n.6 (in denying Mr. Poe's earlier Motion to Dismiss,

Judge Bush explaining that "the IDWR and NPDES permits are not identical, as there is some

overlap but also numerous differences.").  Still, Mr. Poe argues that ICL has not claimed that he

violated either his IDWR permit or any actual NPDES permit requirements (except for the 800-

foot separation requirement (*see supra*)).  Resp. to Mot. for Remedies at 12, 17-20 (Dkt. 63); *but

see* Reply ISO Mot. for Remedies at 11, n.4 (Dkt. 64) (ICL identifying instances where Mr. Poe

violated IDWR permit and reporting requirements attached to NPDES permits).  If so, how do

the environmental impacts of Mr. Poe's unpermitted suction dredge mining stack up against

another's permitted suction dredge mining?  If they are comparable, how "serious" are Mr. Poe's

**MEMORANDUM DECISION AND ORDER  - 21**

CWA violations when evaluating a commensurate civil penalty?  *See, e.g.*, *Magar*, 2015 WL 632367, at \*5 (difficulty in attributing water quality problems to illegal discharges "neither compel nor preclude a reduction to the maximum civil penalty"); *but cf. Atlanta Gold*, 879 F. Supp. 2d at 1168 (finding discharges of arsenic and iron in excess of effluent limitations over three-year period sufficient to justify significant upward adjustment of total civil penalty).

The record does not neatly confront these questions except to underscore the spectrum of possible CWA violations and corresponding levels of impact (seriousness).  What is clear, however, is that Mr. Poe violated the CWA when he suction dredge mined 42 days on the SFCR without the required NPDES permit and that these activities added pollutants to the river and caused environmental harm.  *Supra*.  Any similarities between properly-permitted mining activities and Mr. Poe's unpermitted (but nonetheless allegedly compliant) mining activities largely miss the point and represent a false equivalence.  Mr. Poe should not have been suction dredge mining without an NPDES permit at all.  The liability phase confirmed as much.  Had he not, he never would have discharged pollutants into the waterway, even if his activities otherwise complied with a hypothetical NPDES permit (that may not have even been issued).  Each of the 42 times he did this represents a serious CWA violation that, together, warrant an upward adjustment of the civil penalty amount.

3.    Mr. Poe's Good Faith Efforts to Comply With the CWA

Good faith efforts to comply with applicable requirements may reduce civil penalties. This factor turns on whether Mr. Poe "took any actions to decrease the number of violations or made efforts to mitigate the impact of [his] violations on the environment."  *U.S. v. Smithfield Foods, Inc.*, 972 F. Supp. 338, 349-50 (E.D. Va. 1997).

ICL argues that Mr. Poe took no steps to comply with the CWA or to mitigate the effects of his suction dredge mining.  Mem. ISO Mot. for Remedies at 20 (Dkt. 59-1) ("Poe's

compliance efforts could hardly be less vigorous.  In fact, *non-compliance* has often been Poe's stated intention . . . .") (emphasis in original).  In response, Mr. Poe does not walk back his belief that suction dredge mining does not require an NPDES permit or that he has openly suction dredge mined in opposition to the EPA.  Resp. to Mot. for Remedies at 21 (Dkt. 63).  He instead claims that his opinions are protected by the First Amendment, while noting his consistent compliance with IDWR permit requirements to show that he "still respected the conditions that are in place to minimize and eliminate the environmental impacts of his operations."  *Id*.

Whatever protections exist via the First Amendment, they do not excuse violations of the law and certainly do not amount to good faith efforts to comply with the CWA.  Just the opposite.  And while observing state permitting requirements is better than the alternative, its attendant "no harm no foul" logic comes up short when assessing Mr. Poe's good faith efforts to respect a different, albeit parallel, permitting standard that may have applied to preclude his suction dredge mining on the SFCR and foreclosed its environmental impacts altogether.  *Supra*.  In short, these aspects of Mr. Poe's counterarguments are misplaced.

Despite all this, it is noteworthy that Mr. Poe's insistence against an NPDES permit did not seem to be a knee-jerk reaction to an inconvenient legal requirement getting in the way of his gold mining pursuits.  He was told this by his own attorneys *before* he first suction dredge mined in Idaho in 2014.  Poe Dep., attached as Ex. B to 2nd Hurlbutt Decl. at 13:8-20 (Dkt. 38-5) ("Q: When you went to Idaho, did you have an NPDES permit for suction dredging in Idaho in 2014?  A: No.  Q: Had you applied for one?  A: No.  Q: And why didn't you have one, Mr. Poe?  A: At the advice of my attorney, I didn't.  I was informed that I did not need one."); *see also* Poe Decl. ISO MSJ at ¶12 (Dkt. 39-4) ("I did not obtain an NPDES permit from the Environmental Protection Agency (EPA) [in 2014] because I was informed by my attorney that one was not required.").  What's more, after receiving notice from the EPA in October 2014 about violating

the CWA for suction dredge mining on the SFCR without an NPDES permit, Mr. Poe's counsel wrote back and explained why the EPA's position was wrong. Exs. A & B to Poe Decl. ISO Mot. to Dismiss (Dkt. 17-2). The EPA never responded, never contacted Mr. Poe or his attorney again, and never took any further action. It was thus no real surprise when Mr. Poe suction dredge mined in Idaho in 2015 and 2018 without an NPDES permit, even after receiving ICL's "intent to sue" notices in 2016, 2017, and 2018. Poe Decl. ISO MSJ at ¶ 15 (Dkt. 39-4) ("I did not obtain an NPDES permit from the EPA [in 2015] because, according to counsel, the IDWR permit was the only permit I was legally required to get."); *id*. at ¶ 19 (same for 2018).

It is therefore possible to argue that this is not a situation where Mr. Poe obviously knew better but acted on his impulses and misguided convictions anyway. His attorney told him that an NPDES permit was not required and this advice aligned with his own subjective view on the matter.[10] That said, it does not establish a good faith effort to comply with the CWA (even if it may countenance against a finding of outright bad faith) or render him legally blameless. Short of actually securing the required NPDES permit before suction dredge mining, the proper course of action in this instance was to administratively engage to resolution or proactively seek relief from the courts. Mr. Poe purposely chose not to, ignored violation notices, and proceeded to repeatedly suction dredge mine on the SFCR without a permit. He ultimately did so to his own detriment. Accordingly, an upward adjustment of the civil penalty amount is in order.

    4.    <u>The Economic Impact on Mr. Poe</u>

Courts may reduce the civil penalty against a party if the maximum statutory penalty would work an undue hardship. *Atlantic States Legal Found. v. Universal Tool & Stamping Co.*,

---

[10] In this way, ICL's reliance on *Erlanson* is undercut. There, Mr. Erlanson submitted an NPDES permit application to the EPA but was denied. *In re Dale Erlanson, Sr.*, Docket No. CWA-10-2016-0109 (U.S. Environmental Protection Agency) at 7, attached as Ex. D to 4th Hurlbutt Decl. (Dkt. 59-6). He suction dredge mined anyway.

**MEMORANDUM DECISION AND ORDER - 24**

786 F. Supp. 743, 753-54 (N.D. Ind. 1992).  This factor will not reduce the amount of the penalty unless the violator can show that the penalty will have a "ruinous effect."  *Magar*, 2015 WL 632367, at *7 (citing *U.S. v. Gulf Park Water Co.*, 14 F. Supp. 2d 854, 868 (S.D. Miss. 1998)).

ICL argues that a penalty of at least $564,924 (already reduced from the $1,957,041 maximum penalty) is warranted and will not impose an undue burden on Mr. Poe given his personal assets and close affiliation with AMRA.[11]  Mem. ISO Mot. for Remedies at 21-22 (Dkt. 59-1).  Mr. Poe insists that ICL overstates his financial association with AMRA and that ICL's proposed penalty "places a significant burden" on him individually.  Resp. to Mot. for Remedies at 21-23 (Dkt. 63).  He submits that a $60,924 penalty is more appropriate.  *Id*. at 24.

Mr. Poe is an individual professional miner and claims to have limited annual income and only a limited number of assets.  *Id*. at 23.  To that end, he states that his main source of income over the last few years comes from his mining operations, a previously-owned rental property, and the small consulting fees received from AMRA.  *Id*.  He goes on to identify $3,000 in savings, a 2007 truck worth $5,000-$8,000, a 1985 mobile home worth about $15,000, roughly 16 ounces of gold valued at $28,064, and $75,000 in proceeds from a recent sale of a 10-acre parcel of land.  *Id*.[12]  ICL does not dispute these figures or argue that Mr. Poe is capable of paying its proposed civil penalty from these rather modest income sources and assets; its argument centers on Mr. Poe's alleged access to AMRA's significant financial resources.  Reply

---

[11]  AMRA is a 501(c)(3) non-profit that provides "mining education and assist[s] small miners and public land users with issues that arise when mining on state and federal lands."  Poe Decl. ISO MSJ at ¶ 2 (Dkt. 39-4).  "AMRA focuses on regulatory initiatives that directly affect small miners."  *Id*.

[12]  In comparison, the plaintiff in *Magar* had $11,914.36 deposited in various bank accounts, $3 million in unencumbered assets, and $45,974.58 in monthly income.  *Magar*, 2015 WL 632367, at *7 ("Given evidence that Magar has substantial income and unencumbered assets, the Court is not persuaded that a substantial civil penalty would lead Magar to financial ruin.").  Mr. Poe does not have these same resources.

**MEMORANDUM DECISION AND ORDER  - 25**

ISO Mot. for Remedies at 111-12 (Dkt. 64).  The economic impact that a penalty will have on

Mr. Poe consequently rises and falls with the contours of this relationship.

> To begin, Mr. Poe is a founder and the President of AMRA.  Resp. to Mot. for Remedies

at 5-6 (Dkt. 63).  He submits posts and uploads videos to AMRA's webpage about proposed

federal and state legislation, general mining activity, and issues impacting water rights.  He

promotes AMRA during his mining trips.   He submits his mining activities as content on

AMRA's webpage.  *Id*. at 6.  Despite this administrative involvement with AMRA, the record

reveals that all of Mr. Poe's suction dredge mining on the SFCR in 2014, 2015, and 2018 was

done at his own expense, under his own personal IDWR permits, and for his own personal

economic benefit – not AMRA's.  *Id*. at 6 & 23.  In this context, there is no basis to conclude

that Mr. Poe and AMRA are effectively one-and-the-same.  This action bears that out, with ICL

asserting claims only against Mr. Poe individually, not AMRA institutionally.

> At the same time, Mr. Poe concedes that AMRA provides monetary support to miners,

*including himself*, that are dealing with legal issues.  *Id*. at 6; *see also* Ex. C. to Hurlbutt Decl.

(Dkt. 20-4) (AMRA fundraising posting:  "We could use some new members, we have legal bills

to pay . . . .  You can support AMRA with a $5 monthly donation.  Remember, this goes to fight

for your mining rights . . . ."); Ex. B to 4th Hurlbutt Decl. (Dkt. 59-4) ("We will be doing many

outings, fundraisers, dinners and even yes . . . another Walk for Liberty to raise money for *this*

*legal fight*. . . .  If you'd like to make a donation or join AMRA, clink the link below.")

(emphasis added); *id*. at Ex. C (Dkt. 59-5) ("[W]e need to spend a large amount of money to get

[*this case*] to appeal.  We are looking to raise $150,000 to get there folks. . . .  Want to make a

cash donation, click the link below.").  The true extent of this support, however, and whether it

would apply to a civil monetary penalty, is unknown.  At the end of the day, the mere possibility

of Mr. Poe's access to AMRA's legal defense fund definitely generates "smoke" but not enough

"fire" to legitimize ICL's matter-of-fact statement that, owing to his ties to AMRA, "[Mr.] Poe has significant funds to pay a penalty" of at least $564,924.  Mem. ISO Mot. for Remedies at 22 (Dkt. 59-1).  The record is simply too underdeveloped for such a broad legal conclusion.

All in all, the Court is satisfied that imposing a civil penalty of at least $564,924 would have a more drastic effect on Mr. Poe than is needed to account for his CWA violations and ensure future compliance.  This does not mean that Mr. Poe's suggested $60,924 penalty prevails by default either.  To the contrary, Mr. Poe fails to explain the basis for this significantly lower amount[13] or how a higher penalty would be ruinous to him.  Because Mr. Poe failed to meet this burden, the Court is not limited to the $60,924 penalty he proposes.

     5.    <u>Other Considerations</u>

It is not unusual to try and determine whether a civil penalty is equitable by drawing comparisons to analogous cases.  *See U.S. v. Righter*, 2010 WL 4977046, at *4 (M.D. Pa. 2010) (performing side-by-side comparison of two cases to fashion equitable penalty).  Both ICL and Mr. Poe attempt to do this.  *Compare* Mem. ISO Mot. for Remedies at 14-16 (Dkt. 59-1), *with* Resp. to Mot. for Remedies at 23-24 (Dkt. 63).  These exercises are helpful in the abstract, but rarely supply an "apples to apples" comparison that uncovers an obvious answer.  Cases may deal with different facts, different party statuses (individual vs. corporate), different legal proceedings (court vs. administrative), different manners of resolution (settlement vs. finding of liability), or just different methods of calculation (high per violation penalties in low volume cases vs. low per violation penalties in high volume cases) that frustrate comparison.  *Id*.  The following chart incorporates the parties' cases and confirms as much:

---

[13]  More specifically, Mr. Poe has not supplied the basis for his suggested $1,200 per day violation of the CWA.  This figure, multiplied by Mr. Poe's 42 CWA violations, and then added to his $10,524 economic benefit, amounts to $60,924.

**MEMORANDUM DECISION AND ORDER  - 27**

| **Case**[14] | **Status** | **Max Penalty** | **Imposed Penalty** | **Violations** | **Per violation** |
|---|---|---|---|---|---|
| *Atlanta Gold* | C | $75,150,500 | $2 million (~3%) | 2,000 | $1,000/per |
| *Magar* | I | $187,500 | $100,000 (~53%) | 5 | $20,000/per |
| *Erlanson* | I | $16,000 | $6,600 (~41%) | 1 | $6,600/per |
| *Rice* | I | $16,000 | $3,600 (~23%) | 1 | $3,600/per |
| *Grissom* | I | $203,256 | $24,000 (~12%) | 9 | $2,667/per |
| *Rogue Riverkeeper* | I | $99,525,000 | $96,150 (~.1%) | 2,654 | $37.50/per |
| *Poe* | C | $1,957,041 | ?? | 42 | ?? |

Of note, *Erlanson*, *Rice*, and *Grissom* dealt with suction dredge mining on the SFCR without an NPDES permit which the Court considers relevant when evaluating the seriousness of Mr. Poe's CWA violations. However, only *Erlanson* included a finding of liability (albeit administratively); the *Rice* and *Grissom* penalties resulted from settlements with the EPA. In all, the cases are difficult to reconcile and fact-dependent. Accordingly, they provide only limited comparative guidance.

Suffice it to say, and mindful of the complexities inherent in cases like this, the Court exercises its discretion and assesses a total civil penalty of $150,000 for Mr. Poe's 42 CWA violations. This amount includes (i) the $10,524 direct economic benefit that Mr. Poe received

---

[14] ICL cites to *Atlanta Gold*, *Magar*, and *Erlanson*; Mr. Poe cites to *Rice*, *Grissom*, and *Rogue Riverkeeper*.

**MEMORANDUM DECISION AND ORDER - 28**

from his CWA violations and (ii) $139,476 ($3,320.86 per violation) following the Court's evaluation of the remaining § 1319(d) factors.  *Supra*.

This penalty represents less than 8% of the maximum possible penalty, yet can still be read consistently with the penalties imposed in analogous cases.  It recognizes on the one hand the serious nature of Mr. Poe's 42 violations over three years; on the other hand, it does not ignore the fact that suction dredge mining is allowed on the SFCR (when properly permitted) and that Mr. Poe is an individual suction dredge miner, mines for his own personal benefit, and has limited resources (though receives financial support – to some degree – from AMRA).  With these overarching considerations in mind, the Court is satisfied that this penalty accounts for the harm involved, deters future violations, and represents an equitable application of the law.

## III.  <u>ORDER</u>

Based on the foregoing, IT IS HEREBY ORDERED that ICL's Motion for Remedies (Dkt. 59) is GRANTED as follows:

1.      An injunction consistent with this Memorandum Decision and Order shall issue as part of a separate judgment.

2.      Defendant Shannon Poe shall pay a civil penalty of $150,000 to the United States Treasury.

3.      Within 14 days of this Memorandum Decision and Order, the parties are instructed to submit a joint proposal to the Court, addressing (i) the terms of the injunction and (ii) a deadline for the $150,000 payment and any corresponding payment schedule/logistics.

DATED:  September 28, 2022

_____
Honorable Raymond E. Patricco
Chief U.S. Magistrate Judge

**MEMORANDUM DECISION AND ORDER  - 29**